Richard MESSIER, et al.

v.

SOUTHBURY TRAINING SCHOOL, et al.

No. 3:94–CV–1706 (EBB).

United States District Court, D. Connecticut.

Feb. 7, 1996.

David Shaw, Hartford, CT, for Plaintiffs.

James P. Walsh, Attorney General's Office, Education/Department of Mental Retardation Department, Hartford, CT, for Defendant, Southbury Training School.

Richard T. Lynch, Henry A. Salton, Attorney General's Office, Health & Human Services, Hartford, CT, for Defendant, Patricia Giardi, Commissioner, Connecticut Department of Social Services.

David Paul Friedman, Frank J. Silvestri, Jr., Zeldes, Needle & Cooper, Bridgeport, CT, for Defendant, Home and School Association of Southbury Training School.

### RULING ON MOTION TO DISMISS BY DEFENDANTS SOUTHBURY TRAINING SCHOOL, TONI RICHARDSON & THOMAS HOWLEY

BURNS, Senior District Judge.

Plaintiffs bring this action for injunctive relief against defendants Southbury Training School ("STS") and various state officials, alleging violations of the Due Process Clause of the Fourteenth Amendment, Section 504 of the Rehabilitation Act of 1973 ("Section

504"), the Americans with Disabilities Act ("ADA") and 42 U.S.C. § 1983 ("Section 1983"). Three named defendants—STS, Commissioner of Mental Retardation Toni Richardson and STS Director Thomas Howley—have moved to dismiss on the grounds that plaintiffs' claims are barred under the doctrine of *res judicata*, and on the further grounds that plaintiffs have failed to state a claim upon which relief may be granted. For the following reasons, the defendants' motion [Doc. No. 20] is denied.

## BACKGROUND

In 1986, the United States Department of Justice filed suit against the State of Connecticut under the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997 *et seq.* The Justice Department suit under CRIPA, *United States v. Connecticut,* No. N–86–252 (EBB), sought to remedy allegedly unconstitutional conditions at STS, which is an institution for persons with mental retardation operated by the Connecticut Department of Mental Retardation. In the wake of this litigation, the Justice Department and the State of Connecticut negotiated a Consent Decree which provided for a comprehensive remedial plan to ameliorate conditions at STS. This Court approved the Consent Decree on December 22, 1986.

Prior to approval of the Consent Decree, the Association for Retarded Citizens of Connecticut (ARCC) and six STS residents filed a Motion to Intervene in *United States v. Connecticut.* The proposed intervenors alleged, *inter alia,* that they had not been permitted to participate in negotiating the Consent Decree; that the terms of the Consent Decree would be inadequate to remedy conditions at STS; that the Consent Decree failed to adequately address the residents' right to be considered for community placement; and that the Consent Decree failed to require STS to provide such training to residents as is necessary to preserve the basic self-care skills that they possess when they enter STS. This Court denied the proposed intervenors' Motion to Intervene, on the grounds that the proposed intervenors were not prejudiced by the suit brought by the Justice Department and remained free to file their own lawsuits against STS. Ruling on Pending Motions, Dec. 22, 1986.

In 1990 and 1991, this Court approved two additional Consent Orders, which were negotiated in response to continuing deficiencies found by Justice Department monitoring of STS. In November 1993, Justice Department medical experts and attorneys undertook further investigation of conditions at STS, and found severe deficiencies in care and treatment of residents. These alleged deficiencies include a systemic failure to provide residents with adequate medical care and physical therapy, as well as a near complete absence of behavioral program implementation. The Justice Department indicated its intent to pursue a further enforcement action against STS unless an agreement could be reached as to appropriate remedial steps.

In response to the Justice Department's findings, the Connecticut Department of Mental Retardation retained outside consultants to assess conditions at STS. These consultants largely concurred with the findings of the Justice Department, while also noting progress being made by STS in several areas.

The Justice Department and the State failed to reach an agreement concerning further remedial steps, and the Justice Department sought an order to show cause why the State should not be held in civil contempt. This Court held a hearing on the Justice Department's motion, which is currently pending.

The instant litigation was commenced in October 1994 by the ARCC, seven current STS residents, People First of Connecticut (an advocacy group comprising people with disabilities) and the Western Connecticut Association for Human Rights (an advocacy group comprising parents and families of people with disabilities). On behalf of a putative class of all STS residents, plaintiffs seek, *inter alia,* the following relief: to require STS professionals, in conjunction with each resident and his or her family and friends, to develop and implement an individualized plan of treatment and services appropriate for that resident; to have all residents evaluated for possible community placement

regardless of the severity or nature of their disabilities; to make available to each resident an individual and independent advocate; to enjoin the use of Do Not Resuscitate (DNR) orders until procedures are developed and implemented which assure that such orders will not be issued in error; and, with respect to those residents in STS's Intermediate Care Facility for the Mentally Retarded ("ICF/MR"), to require STS to comply with all federal ICF/MR funding requirements, as set forth at 42 C.F.R. § 483.440.

## DISCUSSION

▋ A motion to dismiss under Fed. R.Civ.P. 12(b)(6) should be granted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). "The function of a motion to dismiss 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir.1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980)). In considering a motion to dismiss, a court must presume all factual allegations of the complaint to be true and must draw any reasonable inferences in favor of the non-moving party. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

## I. Res Judicata

▋ It is well-settled that "[u]nder res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v.*

*McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). In the instant case, Defendants assert that plaintiffs' claims are barred by res judicata, because the plaintiffs are privies of the United States, the plaintiffs' causes of action were or could have been brought in the prior action by the United States, and the consent decree entered into between the United States and the State of Connecticut constitutes a final judgment on the merits. This Court disagrees. As is discussed further below, res judicata is inapplicable to the instant case, because plaintiffs in this action are able to pursue causes of action and types of relief that were unavailable to the United States in the prior action, and plaintiffs are not in fact in privity with the United States.[1]

## A. Differing Causes of Action and Types of Relief Available to Plaintiffs

▋ Prior to the enactment of CRIPA in 1980, controlling precedents dictated that the Justice Department had no authority to sue on behalf of institutionalized persons. *See, e.g., United States v. Mattson*, 600 F.2d 1295, 1297 (9th Cir.1979). Under CRIPA, however, the Attorney General may bring suit for equitable relief to ensure the "minimum corrective measures" necessary to remediate "egregious or flagrant conditions which deprive [institutional residents] of any [federally protected] rights, privileges, or immunities," provided the Attorney General finds that such deprivations occur "pursuant to a pattern or practice of resistance." 42 U.S.C. § 1997a. Thus, the Justice Department may only sue on behalf of institutionalized persons if the strict requirements of CRIPA are satisfied, and may only seek "minimum corrective measures."[2]

---

**1.** The question of whether a suit brought by the United States under CRIPA bars a later suit by institutional residents is apparently one of first impression. However, one federal district court in the District of Massachusetts, in considering a motion to intervene by institutional residents in a CRIPA suit, stated in dicta that:

A court faced with a subsequent suit filed by the residents would not be able to use the doctrines of claim preclusion or issue preclusion against the residents. A judgment against the United States in this CRIPA suit could not

be used against the residents to bar any claims raised or any claims that could have been raised, because the residents were not parties or privies in this suit.

*United States v. Massachusetts*, No. 85–0632–MA (D.Mass., Apr. 28, 1986).

**2.** It is solely the province of the Attorney General to determine the existence of these extra prerequisites to suit under CRIPA. Once the Attorney General has brought suit, having determined that CRIPA's prerequisites are satisfied, The United States is treated no differently than any other

In contrast, in order to establish a claim under the Due Process Clause, Section 504, the ADA and Section 1983, plaintiffs in this action need not meet the requirements of CRIPA and may seek more than minimum corrective measures. The Ninth Circuit has aptly summarized this difference, commenting with respect to a case brought under CRIPA that, whereas institutional residents are concerned with all aspects of conditions at their facility, "[t]he United States in this litigation is concerned only with flagrant-conditions." *United States v. Oregon,* 839 F.2d 635, 638–39 (9th Cir.1988); *see also United States v. Michigan,* 116 F.R.D. 655, 663 (W.D.Mich.1987) (noting that remedies under a CRIPA consent decree are limited to "minimum corrective measures").

This discrepancy between the causes of action and types of relief available to the Justice Department and to institutional residents is evident in the instant case. For instance, neither the Complaint filed by the Justice Department nor the Consent Decree entered into by the Justice Department and the State of Connecticut addressed the residents' right to receive such training as is necessary to preserve those self-care skills that residents possess upon entering STS. Similarly, neither the Complaint nor the Consent Decree addressed the right of residents in ICF/MR units to receive "active treatment," as is required by 42 U.S.C. § 1396d(d)(2) and 42 C.F.R. § 483.440. Moreover, neither the Complaint nor the Consent Decree sought to require STS to consider all residents for community placement. Finally, neither the Complaint nor the Consent Decree sought to enjoin STS from issuing DNR orders. Each of the above remedies is sought by plaintiffs in the instant case.

Thus, in the instant case there is manifest evidence that the statutory structure of CRIPA prevented the Justice Department from pursuing all of the causes of action and types of relief which are available to the plaintiffs. For this reason, plaintiffs' claims are not barred under res judicata. *See Burka v.*

*New York City Transit Auth.,* 32 F.3d 654, 658 (2nd Cir.1994) (holding that res judicata is not applicable to a claim for relief that was unavailable in the earlier action).

## B. Absence of Privity

 Literal privity need not exist between two parties in order for one party to be claim precluded by an action brought by the other. *Alpert's Newspaper Delivery Inc. v. The New York Times Co.,* 876 F.2d 266, 270 (2d Cir.1989). Rather, the appropriate inquiry concerns whether the party against whom preclusion is sought was adequately represented by another party vested with authority of representation. *Id.; Expert Electric, Inc. v. Levine,* 554 F.2d 1227, 1233 (2d Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977). This inquiry must be a "factual determination of substance, not mere form." *Expert Electric,* 554 F.2d at 1227.

In *United States v. Connecticut,* the Justice Department brought suit under CRIPA in order to protect the constitutional rights of STS residents. The Justice Department did not, of course, have any actual consent from STS residents to provide representation on their behalf. Indeed, to the contrary, the ARCC and individual STS residents sought to intervene on the grounds that the Justice Department was not adequately protecting their interests.

Thus, the only authority by which the Justice Department represented STS residents was CRIPA itself. The defendants assert that CRIPA and its legislative history indicate a congressional intent to authorize the Justice Department to represent institutionalized persons. However, any such argument must be qualified by reference to CRIPA's disclaimer respecting private litigation, which states in relevant part:

> The provisions of this subchapter shall in no way expand or restrict the authority of parties other than the United States to enforce the legal rights which they may have pursuant to existing law with regard to institutionalized persons.

litigant, and has neither a greater nor lesser burden of proof than that faced by an individual institutional resident bringing suit on his or her

own behalf. *U.S. v. Pennsylvania,* 863 F.Supp. 217, 220 (E.D.Pa.1994).

42 U.S.C. § 1997j. The precise interplay between this clause and res judicata principles is not entirely clear and need not be decided in the instant case.[3] At the very least, however, § 1997j clearly undercuts any assertion that CRIPA definitively authorizes the Attorney General to serve as a binding representative of institutionalized persons.

Most significantly, whether or not the Justice Department can be said to have been authorized to represent STS residents, this Court finds that the Justice Department did not adequately represent such residents. A finding of inadequate representation is required based upon the above discussion of the limited causes of action and types of relief available to and pursued by the Justice Department in *United States v. Connecticut.* Since the Justice Department did not seek all of the types of relief which plaintiffs seek in this case, it follows directly that the Justice Department's representation was inadequate from a res judicata perspective, and that the plaintiffs are therefore not in privity with the United States. *See Williamson v. Bethlehem Steel Corp.,* 468 F.2d 1201, 1203 (2d Cir.1972) (holding that six employees bringing suit under Title VII were not in privity with the United States, which had brought a previous suit against the same employer, because the employees sought a type of relief which the United States had not sought), *cert. denied,* 411 U.S. 931, 93 S.Ct. 1893, 1902, 36 L.Ed.2d 390 (1973).[4]

Thus, the requirements of res judicata are not satisfied, as plaintiffs have available causes of action and types of relief that were unavailable to the United States, and plaintiffs are not in privity with the United States. Plaintiffs' claims therefore are not barred by res judicata.[5]

## II. Failure to State A Claim Upon Which Relief Can Be Granted

Defendants assert that plaintiffs' actions under the Due Process Clause, Section 504, the ADA and Section 1983 all fail to state a claim upon which relief may be granted. This court disagrees. As the following discussion shows, each of plaintiffs' actions states a claim upon which relief may be granted.

### A. Due Process Claim

In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court established the contours of the right of residents in state-operated institutions for the mentally retarded to sue under the Due Process Clause of the Fourteenth Amendment. The Court found unequivocally that such residents possess a constitutional right to adequate food, shelter, clothing, medical care, safe conditions of confinement and freedom from unreasonable bodily restraints, as well as a right to such training and skill development as is neces-

---

**3.** Section 1997j evinces Congress' intent that CRIPA should have no impact on the existing rights of individuals to bring suit. However, such an intent could be interpreted to mean either that Congress wished all pre-existing legal rules to apply to potential plaintiffs, including res judicata, or that Congress intended that CRIPA in no way prejudice individual plaintiffs, even by virtue of res judicata. This Court finds it unnecessary to choose between these two competing interpretations of § 1997j. Even under the former interpretation, advocated by defendants in this suit, res judicata would nevertheless be inapplicable to the instant case, because plaintiffs have different causes of action and remedies available to them, and are not in privity with the United States.

**4.** There can be no dispute that the consent decree entered into by the parties in *United States v. Connecticut* represents a final judgment on the merits. *Amalgamated Sugar Co. v. NL Indus., Inc.,* 825 F.2d 634, 639 (2d Cir.), *cert. denied,* 484

U.S. 992, 108 S.Ct. 511, 98 L.Ed.2d 511 (1987). However, the contractual nature of consent decrees reinforces this Court's finding that the plaintiffs in the instant case are not in privity with the United States. *See United States v. City of Jackson,* 519 F.2d 1147, 1152 (5th Cir.1975) ("A consent decree is in many respects a contract between the parties thereto ... such decrees do not purport to be definitive statements of the parties' legal rights and [courts] will accord them little or no weight in the determination of the rights of persons not party to them.").

**5.** This finding is fully consistent with this Court's ruling on the ARCC's Motion to Intervene in *United States v. Connecticut.* In that ruling, this Court denied intervention on the grounds that the proposed intervenors would not be prejudiced by the Justice Department's CRIPA litigation, as the proposed intervenors would remain free to bring suit individually. Ruling on Pending Motions, Dec. 22, 1986.

sary to protect these constitutional guarantees. 457 U.S. at 315–18, 102 S.Ct. at 2457–59. Although the Court did not decide whether institutional residents have a right to other types of training and skill development, the Second Circuit has determined that residents have a due process right to "training sufficient to prevent basic self-care skills from deteriorating." *Society for Good Will to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239, 1250 (2d Cir.1984). *Cf. Youngberg,* 457 U.S. at 327–29, 102 S.Ct. at 2464–65 (Blackmun, J., concurring) (noting that the majority opinion leaves open the question of a right to training to preserve those self-care skills possessed by a resident upon institutionalization).

▮ The *Youngberg* Court established a "professional judgment" standard for determining whether a state-operated institution has satisfied its obligations to residents under the Due Process Clause. 457 U.S. at 321–23, 102 S.Ct. at 2461–62. Under this standard, a state institution may be held liable for a decision made by a professional "only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.,* at 323, 102 S.Ct. at 2462; *accord Society for Good Will to Retarded Children,* 737 F.2d at 1248.

▮ The *Youngberg* professional judgment standard governs claims for failure to provide community placement. Thus, whereas "there is no constitutional right to community placement," a decision to keep a resident in an institutional rather than community setting is only constitutional to the extent that it is a "rational decision based on professional judgment." *Society for Good Will to Retarded Children,* 737 F.2d at 1249.

In the instant case, plaintiffs allege in Count One of their complaint that defendants have failed to provide adequate shelter, clothing, nutrition and medical care; have failed to provide sufficient training to help residents maintain self-care skills and to ensure a safe environment free from unnecessary restraint; and have failed to consider all residents for possible community placement, as would be required by professional judgment. Presuming the facts alleged in plaintiffs' complaint to be true, plaintiffs' due process action clearly states a claim upon which relief can be granted.

**B. Section 504 and ADA Claims**

▮ Plaintiffs assert that defendants, by failing to consider certain severely handicapped residents for community placement, have violated both Section 504 and the ADA.[6] For the purpose of plaintiffs' motion, defendants concede the applicability of both Section 504 and the ADA. Defendants' sole contention, other than the res judicata argument discussed previously, is that neither Section 504 nor the ADA confers a "right to community placement." Defendants are correct in this assertion. *See, e.g., Helen L. v. DiDario,* 46 F.3d 325, 336 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995). However, defendants misconstrue plaintiffs' complaint. Rather than asserting an absolute right to community placement, plaintiffs allege that defendants, by failing to consider certain severely handicapped residents for community placement, have practiced discrimination on the basis of severity of disability. This Court considers whether relief may be granted based upon such a claim.

Pursuant to Section 504, the former Department of Health, Education and Welfare ("HEW"), now the Department of Health and Human Services ("HHS"), promulgated en-

**6.** Section 504 provides that:
No otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal assistance.
29 U.S.C. § 794. Title II of the ADA, which extends Section 504's coverage to state and local governments, mirrors the language of Section 504, providing that:
[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity.
42 U.S.C. § 12132.

forcement regulations, including the following:

(b) Discriminatory actions prohibited.

(1) A recipient [of federal funding], in providing any aid, benefit or service, may not . . .

(iv) Provide different or separate aid, benefits or services to handicapped persons or to any class of handicapped persons unless such action is necessary to provide qualified handicapped persons with aid, benefits, or services that are as effective as those provided to others.

45 C.F.R. § 84.4(b)(1).

Congress drafted the ADA so as to be largely consistent with Section 504, while at the same time extending its provisions. *See Helen L. v. DiDario*, 46 F.3d at 329–35 (tracing the drafting of the ADA and its relation to Section 504). Accordingly, Title II of the ADA directs that the Attorney General shall promulgate enforcement regulations and that "such regulations shall be consistent with [those regulations] applicable to recipients of Federal financial assistance under [Section 504]." 42 U.S.C. § 12134(b). Pursuant to this mandate, the Department of Justice promulgated regulations under Title II mirroring those promulgated under Section 504, including the following:

35.130 General prohibitions against discrimination.

(b)(1) A public entity, in providing any aid, benefit, or service, may not . . .

(iv) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others, unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others.

28 C.F.R. § 35.130.

■■■■■ The regulations promulgated under both Section 504 and the ADA thus clearly prohibit discrimination based upon severity of disability. An interpretation of an agency charged with the administration of a statute is entitled to substantial deference, *Blum v. Bacon*, 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982), and should be given controlling weight unless such interpretation is arbitrary, capricious or manifestly contrary to the statute. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694, *reh'g denied*, 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984). Additionally, when Congress, in enacting a statute, explicitly approves of prior administrative interpretations of a law, Congress is treated as having adopted such interpretations. *United States v. Board of Comm'rs of Sheffield, Alabama*, 435 U.S. 110, 134, 98 S.Ct. 965, 980–81, 55 L.Ed.2d 148 (1978). Thus, Congress's instruction to the Attorney General to promulgate regulations under the ADA consistent with those promulgated under Section 504 indicates congressional approval of the above-cited specific prohibitions.

Moreover, numerous courts have recognized that both Section 504 and the ADA prohibit discrimination on the basis of the severity of a person's disability. *See, e.g., Helen L. v. DiDario*, 46 F.3d at 336 ("[I]f Congress were only concerned with disparate treatment of the disabled as compared to their nondisabled counterparts," then the ADA's reference to the persistence of discrimination in institutionalization would constitute a "non sequitur"); *Plummer v. Branstad*, 731 F.2d 574, 578 (8th Cir.1984) (severity of handicap cannot be sole reason for denying Title XX funding); *Martin v. Voinovich*, 840 F.Supp. 1175, 1191–92 (S.D.Ohio 1993) (both Section 504 and the ADA prohibit discrimination on the basis of severity of handicap); *Jackson v. Fort Stanton Hosp. & Training School*, 757 F.Supp. 1243, 1299 (D.N.M.1990) ("The severity of plaintiffs' handicaps is itself a handicap which, under § 504, cannot be the sole reason for denying plaintiffs access to community programs."), *rev'd on other grounds*, 964 F.2d 980 (10th Cir.1992); *Garrity v. Gallen*, 522 F.Supp. 171, 214–15 (D.N.H. 1981) (discrimination based upon a generalized assumption concerning the abilities of a group of severely handicapped persons is actionable under Section 504); *Lynch v. Maher*, 507 F.Supp. 1268, 1278–79 n. 15 (D.Conn.1981) (discrimination on the basis of

extent of handicap is actionable under Section 504).[7]

Thus, under both statutes, STS is prohibited from refusing to consider certain residents for possible community placement, merely based upon the degree of their disabilities. Plaintiffs allege in Count Two of their complaint that defendants have failed to consider certain severely disabled residents for community placement. Presuming the facts alleged in plaintiffs' complaint to be true, plaintiffs' actions under Section 504 and the ADA clearly state claims upon which relief can be granted.

## C. Section 1983 Claim

■■■ As a condition of receiving funds for ICF/MR units under the Social Security Act, STS is required to provide "active treatment" to all ICF/MR residents, 42 U.S.C. § 1396d(d)(2), and to "meet such standards as may be prescribed by [HHS]." 42 U.S.C. § 1396d(d)(1). Pursuant to these provisions, HHS has promulgated requirements as to what constitutes active treatment, as well as detailed standards concerning what services must be provided to ICF/MR residents, which are set forth at 42 C.F.R. § 483.440. Plaintiffs contend that defendants have violated these requirements, and plaintiffs seek relief for such violations under Section 1983. Defendants assert that, even if violations of the ICF/MR requirements could be shown, plaintiffs have no right to sue under Section 1983.[8]

## 1. The Evolving Analytic Framework

In a series of cases, the Supreme Court has established a framework for determining when there exists a right to sue under Section 1983 for violation of a federal statute. In *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Court established that Section 1983 generally provides a cause of action for violations of federal statutes by state and local governmental units. 448 U.S. at 4, 100 S.Ct. at 2504. Subsequently, the Court recognized two exceptions to this rule: (1) cases in which the statute in question does not create an enforceable "right, privilege or immunity"; and (2) cases in which such a right exists but Congress has foreclosed enforcement of the right under Section 1983. *Wright v. Roanoke Redevelopment & Housing Auth.,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987).

In *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), the Court clarified the criteria for determining whether either of the two exceptions is applicable. Under the first exception, the Court held that no enforceable right exists if: the statutory provision in question was not intended to benefit the putative plaintiffs; the provision reflects merely a "congressional preference" rather than a "binding obligation"; or the plaintiffs' interest is "too vague and amorphous" such that it is "beyond the competence of the judiciary to

---

**7.** The Supreme Court's decision in *Traynor v. Turnage,* 485 U.S. 535, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988) is inapposite to this case. The primary holding of *Traynor* was that the 1978 amendments to the Rehabilitation Act of 1973 should not be deemed to have repealed a 1977 statute (codified at 38 U.S.C. § 1662(a)(1)) which allowed for an extension of time to use veterans' benefits under certain circumstances, but only on the condition that a veteran's physical or mental disorder was not a result of willful misconduct by that veteran. *Id.,* at 548, 108 S.Ct. at 1381–82. The Court did state in dicta that "the central purpose" of Section 504 is "to assure that handicapped individuals receive 'even-handed treatment' in relation to non-handicapped individuals" (citations omitted), and that "there is nothing in [Section 504] that requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons." *Id.,* at 548–49, 108 S.Ct. at 1382–83. However, the

circumstances underlying *Traynor* clearly show that the Court was not considering whether discrimination based upon extent of disability is generally actionable under Section 504. Rather, the Court had no need to consider this question, because the regulations promulgated under Section 504 by HEW provide that Section 504 does not prohibit "exclusion of a specific class of handicapped persons from a program limited by federal statute or executive order to a different class of handicapped persons." 45 C.F.R. § 84.4(c). This exception to Section 504's coverage is clearly not applicable to the instant case.

**8.** Defendants also assert that plaintiffs have failed to allege any violations of the ICF/MR requirements. To the contrary, however, paragraph 79 of plaintiffs' Second Amended Complaint alleges specific violations of these requirements.

enforce." *Id.,* at 509, 110 S.Ct. at 2517 (citing *Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 106, 110 S.Ct. 444, 448–49, 107 L.Ed.2d 420 (1989)).

With respect to the second exception, courts "[should] not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right." *Id.,* at 520, 110 S.Ct. at 2523. (citations omitted). Thus, defendants have the burden of showing " 'by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement.' " *Id.,* at 520–21, 110 S.Ct. at 2523. (quoting *Wright,* 479 U.S. at 423, 107 S.Ct. at 770). In the absence of an express provision, private enforcement may only be deemed to be foreclosed if the statute itself creates a remedial scheme that is " 'sufficiently comprehensive ... to demonstrate congressional intent to preclude the remedy of suits under § 1983.' " *Id.,* at 521, 110 S.Ct. at 2523 (quoting *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981)).

Two years after *Wilder,* in *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), the Supreme Court considered whether a class of children subject to abuse, neglect or dependency petitions had a right to sue under Section 1983 for a state's alleged violation of 42 U.S.C. § 671(a)(15). Section 671(a)(15) requires states receiving federal assistance for foster care and adoption services to devise a plan which includes both reasonable efforts to eliminate the need for removing children from their homes and, with respect to cases in which children are removed, reasonable efforts toward reunification.

The *Suter* Court found that the plaintiff class did not have a right to sue under Section 1983 for alleged violations of § 671(a)(15). In reaching this decision, the Court did not make explicit reference to the well-established framework which had been reaffirmed and clarified by the Court two years earlier in *Wilder.* The Court did, however, distinguish *Suter* from *Wilder,* based upon two principal grounds. First, the Court

found that the only obligation which § 671(a)(15) unambiguously imposed upon a participating state is that it have a plan approved by HHS. 503 U.S. at 358, 112 S.Ct. at 1367–68. Thus, even if the defendant in *Suter,* the State of Illinois, had not in fact devised or carried out a plan involving the required "reasonable efforts," the state nevertheless would have been in full compliance with its obligations, because the state's plan had been approved by HHS. *Id.* Secondly, the Court found that neither § 671(a)(15) nor the regulations promulgated thereunder contain sufficient guidance concerning the meaning of the "reasonable efforts" requirement so as to allow a court to determine whether or not a state is in compliance therewith. *Id.,* at 360, 112 S.Ct. at 1368–69.

Although the Court's decision in *Suter* did not explicitly adopt the *Wilder* framework, the *Suter* Court also declined to overrule *Wilder.* Rather, the Court cited parts of *Wilder* and *Wright* with approval, while carefully distinguishing *Suter* on its facts. Thus, in the wake of *Suter,* the circuit courts moved toward synthesizing *Suter* into the *Wilder* framework. *See, e.g., Howe v. Ellenbecker,* 8 F.3d 1258, 1262 n. 5 (8th Cir.1993) ("[A]lthough *Suter* weakened earlier precedent in vital respects, the Court was careful not to explicitly overrule the *Wilder* framework."), *cert. denied,* —— U.S. ——, 114 S.Ct. 1373, 128 L.Ed.2d 49 (1994); *Miller v. Whitburn,* 10 F.3d 1315, 1319 (7th Cir.1993) ("[*Suter*] is not the death knell of the analytic framework established in *Wilder.*") (citation omitted); *Chan v. City of New York,* 1 F.3d 96, 104 (2d Cir.) (adopting "the *Wilder* analysis or, to the extent that it differs, the *Suter* analysis"), *cert. denied,* —— U.S. ——, 114 S.Ct. 472, 126 L.Ed.2d 423 (1993); *Stowell,* 976 F.2d at 68 (finding it "both prudent and possible to synthesize the teachings of *Suter* with the Court's prior precedents").

Whereas the various circuits each sought to harmonize *Suter* with previous precedent, the circuits varied as to which aspect of *Suter* should be deemed most significant. For instance, the First Circuit found that *Suter* added the following threshold consideration to the *Wilder* framework: "[W]hen a provi-

sion in a statute fails to impose a direct obligation on the States, instead placing the onus of compliance with the statute's substantive provisions on the federal government, no cause of action cognizable under section 1983 can flourish." *Stowell,* 976 F.2d at 70. In contrast, the Second Circuit has held that "the significant point in *Suter* was not that the statute in question only required a state to submit a plan to the federal agency, but that the statute provided no guidance for measuring 'reasonable efforts.'" *Marshall v. Switzer,* 10 F.3d 925, 929 (2d Cir. 1993) (citing *Chan,* 1. F.3d at 104). In a similar vein, the District of Columbia Circuit has held that "[t]he *Suter* Court's principal concern was the Act's vagueness," and that *Suter* therefore did not change existing precedent. *LaShawn A. v. Barry,* 69 F.3d 556, 569–70 (D.C.Cir.1995), *vacated and reh'g in banc granted,* 74 F.3d 303, (D.C.Cir.1996).[9]

In October 1994, Congress sought to overturn what it saw as the *Suter* Court's deviation from the established *Wilder* framework. Accordingly, Congress enacted the following amendment to the Social Security Act: [10]

> In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in *Suter v. Artist M.,* 112 S.Ct. 1360 (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided however that this section is not intended to alter the holding in *Suter v. Artist M.* that section 671(a)(15) of this title is not enforceable in a private right of action.

Pub.L. No. 103–382, 108 Stat. 4057 (codified at 42 U.S.C. § 1320a–2) ("Section 1320a–2").

The few courts that have had the opportunity to rule on the impact of Section 1320a–2 have issued somewhat conflicting interpretations. Several district courts, subscribing to the view that the *Suter* Court based its decision on the fact that 42 U.S.C. § 671(a)(15) required only that participating states submit a plan to HHS for approval, have taken Section 1320a–2 at its face value and have therefore reverted to applying the *Wilder* framework unmodified by *Suter.* See, e.g., *Ward v. Thomas,* 895 F.Supp. 406, 409 (D.Conn.1995); *Harris v. James,* 883 F.Supp. 1511, 1519 (M.D.Ala.1995); *Jeanine B. v. Thompson,* 877 F.Supp. 1268, 1283 (E.D.Wis. 1995). In contrast, however, the District of Columbia Circuit and at least one district court have taken the view that *Suter* did not in fact modify pre-existing law, and that, therefore, Section 1320a–2 has no effect whatsoever. *LaShawn A.,* 69 F.3d at 570, *vacated and reh'g in banc granted,* 74 F.3d 303 (D.C.Cir.1996); *Neal v. Ridge,* 1995 WL 728589, at *3 (E.D.Pa. Dec. 7, 1995). Although divergent in methodology, both of the above interpretations lead to the same endpoint: courts should apply the *Wilder* framework, unmodified by *Suter.*

Arguably, the appropriate Second Circuit interpretation of Section 1320a–2 should be slightly different from either of the above interpretations. In *Chan* and *Marshall,* the Second Circuit found that *Suter* may have modified the *Wilder* framework, but if so only by placing renewed emphasis on the requirement that statutory language must be definite and specific in order to confer an enforceable right. *Marshall,* 10 F.3d at 929; *Chan,* 1. F.3d at 104. If *Suter* did in fact modify prior precedent in this way, then, arguably, Section 1320a–2 does not reverse this modification, as the fairest reading of Section 1320a–2 is that Congress was concerned only that a court should not eviscerate an otherwise enforceable right merely because it appears in a statute mandating

---

**9.** The District of Columbia Circuit's recent decision to grant rehearing *in banc* in *LaShawn A.* casts some doubt upon this holding. However, the circuit's original holding may yet survive, as *LaShawn A.* included numerous difficult issues which may have prompted the circuit's decision to grant rehearing *in banc.*

**10.** Although Congress passed this amendment fully fifty-five days prior to the date on which defendants filed the instant Motion to Dismiss, both parties inexplicably failed to mention the amendment in their briefs.

that participating states include a particular provision in their state plans. According to this reasoning, it would still be appropriate for courts in the Second Circuit to apply the *Wilder* framework, modified slightly by *Suter* in that the requirement of specific statutory language should be strictly interpreted. Ultimately, however, this Court need not definitively ascertain the effect of *Suter* and of Section 1320a–2. As the following analysis shows, Section 1396d(d) and the regulations promulgated thereunder certainly confer an enforceable right, whether analyzed according to a straightforward *Wilder* analysis or, equally, according to a *Wilder* analysis modified slightly by *Suter*.[11]

**2. The Analytic Framework Applied**

Under either a *Wilder* or modified *Wilder* analysis, the general rule remains that violation of a federal statute is remediable under Section 1983 unless one of two exceptions applies. Under the former exception, this Court must examine three criteria in order to determine whether the statutory scheme confers an enforceable right. First, the Court finds that those members of plaintiffs' putative class who are ICF/MR residents are clearly the intended beneficiaries of the statutory scheme. *Wilder*, 496 U.S. at 509, 110 S.Ct. at 2517. There can be no doubt that each of the detailed requirements set forth at 42 C.F.R. § 483.440 was drafted with the principal goal of ensuring quality care for ICF/MR residents.

Second, § 1396d(d) and the regulations promulgated thereunder clearly impose a binding obligation upon participating states, rather than merely stating a congressional preference that particular services be provided. *Wilder*, 496 U.S. at 509, 110 S.Ct. at 2517. Notably, the ICF/MR regulations set forth at 42 C.F.R. § 483.440 are entitled "Conditions of participation," and each subpart is written in clearly obligatory language.

*See, e.g.*, 42 C.F.R. § 483.440(a)(1) ("Each client must receive a continuous active treatment program, which includes ... generic training, treatment, health services and related services described in this subpart, that is directed toward (i) The acquisition of behaviors necessary for the client to function with as much self determination and independence as possible; and (ii) The prevention or deceleration of regression or loss of current optimal functional status.").

Third, even if the provisions at issue are viewed through the strict lens of *Suter*, the standards which defendants are alleged to have violated are not "too vague and amorphous" such that they would be "beyond the competence of the judiciary to enforce." *Wilder*, 496 U.S. at 509, 110 S.Ct. at 2517. Rather, the provisions at issue in this case are analogous to those in 29 U.S.C. §§ 721(a)(8) & (a)(9), which the Second Circuit in *Marshall* found to be "specific and definite, and therefore within the competence of the judiciary to enforce." 10 F.3d at 929. *Compare, e.g.*, 29 U.S.C. § 721(a)(9) ("[Each state plan] must provide that ... (B) an individualized written rehabilitation program ... will be developed for each individual with a disability eligible for vocational services under this chapter; (C) such services will be provided under the plan in accordance with such program ...") *with* 42 C.F.R. § 483.440(c)(1) ("Each client must have an individual program plan developed by an interdisciplinary team that represents the professions, disciplines or service areas that are relevant to (i) Identifying the client's needs, as described [later in this section]; and (ii) Designing programs that meet the client's needs.").

Having found that each of the three criteria set forth under the first *Wilder* exception points toward finding an enforceable right to sue, the Court lastly examines the

11. The Court also notes that Section 1320a–2 is arguably an unconstitutional attempt by Congress to impose a particular rule of decision or means of statutory interpretation upon the judiciary. *See LaShawn A.*, 69 F.3d at 581 (Randolph, J., dissenting) (discussing questionable constitutionality of Section 1320–a). If so, then there is an argument to be made that courts should still find no enforceable right to be conferred by a statute mandating only inclusion of a particular provision in a state plan. However, even if such were the current state of the law, the outcome of the instant motion would be no different, because § 1396d(d) and the regulations promulgated thereunder require participating states to actually provide particular services rather than merely include such services in a plan.

second exception set forth under *Wilder*—whether Congress has foreclosed enforcement of the right under Section 1983. As noted previously, a court may only conclude that Congress has intended to preclude suit under Section 1983 if the statute in question either includes an express provision to that effect or creates a remedial scheme sufficiently comprehensive so as to indicate Congress's intent. *Wilder,* 496 U.S. at 520–21, 110 S.Ct. at 2523–24.

In the instant case, the provisions of the Social Security Act at issue contain no express provision foreclosing suit and provide no remedial scheme by which ICF/MR residents may petition to obtain greater services. Indeed, the only remedial measure established by the statutory scheme is withdrawal of funding by HHS for non-compliance with program conditions. 42 U.S.C. § 1396i(b). In *Wilder,* the Supreme Court found that an analogous remedial measure authorizing HHS to withdraw funds for non-compliance in no way indicated Congressional intent to foreclose suit under Section 1983. 496 U.S. at 521–22, 110 S.Ct. at 2523–24.

Thus, neither of the exceptions set forth under *Wilder* are applicable in the instant case, meaning that plaintiffs may validly sue under Section 1983 for alleged violations of the federal program requirements for ICF/MR units. Presuming the facts alleged in plaintiffs' complaint to be true, plaintiffs' Section 1983 action clearly states a claim upon which relief can be granted.

## SUMMARY

Defendants' Motion to Dismiss [Doc. No. 20] is denied.

SO ORDERED.