United States Court of Appeals,

Eleventh Circuit.

No. 97-8538.

L.C., by Jonathan ZIMRING as guardian ad litem and next friend;  E.W., Plaintiffs-Appellees.

v.

Tommy OLMSTEAD, Commissioner of the Department of Human Resources;  Richard Fields, Superintendent of Georgia Regional Hospital at Atlanta;  Earnestine Pittman, Executive Director of the Fulton County Regional Board, all in their official capacities, Defendants-Appellants.

April 8, 1998.

Appeal from the United States District Court for the Northern District of Georgia.  (No. 1:95-CV-1210-MHS), Marvin H. Shoob, District Judge.

Before TJOFLAT and BARKETT, Circuit Judges, and PROPST[*], Senior District Judge.

BARKETT, Circuit Judge:

Tommy Olmstead, Richard Fields, and Earnestine Pittman, (collectively "the State"), defendants in the district court, appeal an adverse summary judgment granting declaratory and injunctive relief to plaintiffs L.C. and E.W.,[1] two patients then-housed in a state psychiatric hospital.[2]  In May 1995, L.C. filed this action challenging her continued confinement at the Georgia

---

[*]Honorable Robert B. Propst, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

[1]As the district court did, we use the pseudonyms L.C. and E.W. in order to protect plaintiffs' identities.

[2]Both L.C. and E.W. are currently being treated in community-based programs.  L.C. was placed in a community-based program in February 1996, while this action was pending in the district court;  E.W. was placed in a similar program after the district court entered its judgment. Nonetheless, this case is not moot.  Mootness has been defined as " "the doctrine of standing set in a time frame:  The requisite personal interest that must exist at the commencement of the litigation (standing) must continue through its existence (mootness).' "  *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 397, 100 S.Ct. 1202, 1209, 63 L.Ed.2d 479 (1980) (quoting Monaghan, *Constitutional Adjudication:  The Who and When,* 82 Yale L.J. 1363, 1384 (1973)).

Regional Hospital in Atlanta ("GRH-A"), a psychiatric hospital where persons with mental disabilities are cared for in a segregated environment. The State's failure to provide her with care in the most integrated setting appropriate to her needs, she argued, violated Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-12134 (1995), the Attorney General's Title II regulations, 28 C.F.R. § 35.130 (1997), and the Due Process Clause of the Fourteenth Amendment. In January 1996, E.W., a patient also confined at GRH-A, intervened in this action, raising identical claims.

In granting summary judgment in favor of L.C. and E.W., the district court declared that the State's failure to place them in an appropriate community-based treatment program, instead confining them at the state hospital, violates the anti-discrimination provision of Title II of the ADA, 42 U.S.C. § 12132, and its accompanying regulations. The district court enjoined the State from violating plaintiffs' rights under the ADA, determined that the denial of community placements could not be justified by the State's purported lack of funds, and ordered the State to release E.W. to an appropriate community-based treatment program and to provide L.C. with all appropriate services necessary to maintain her current placement in a community-based treatment program.

We affirm the district court's judgment that the State discriminated against L.C. and E.W.

As the district court concluded, L.C.'s suit falls under the exception for cases that are "capable of repetition, yet evading review." L.C. has been confined eighteen different times at GRH-A and her current placement has been unstable at times due to the State's failure to provide adequate funding. Therefore, it is likely that L.C. may be returned to GRH-A. Further, because of the complexity of the issues involved and instability of her placements, it is likely that any future claim for relief will evade our review. *See Honig v. Doe,* 484 U.S. 305, 318-23, 108 S.Ct. 592, 601-04, 98 L.Ed.2d 686 (1988); *Lynch v. Baxley,* 744 F.2d 1452, 1456-57 (11th Cir.1984). As to E.W., because the State only placed her in a community-based treatment program under court order, it is likely that, absent the court order, the State might revert to its prior practices. *See Vitek v. Jones,* 445 U.S. 480, 486-87, 100 S.Ct. 1254, 1260-61, 63 L.Ed.2d 552 (1980). Further, like L.C., E.W. has been subject to multiple and unstable placements at GRH-A, making her claim one that is capable of repetition, yet evading review.

by confining them in a segregated institution rather than in an integrated community-based program. However, we remand this case to the district court for further findings related to the State's defense that the relief sought by plaintiffs would "fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).[3]

## DISCUSSION

This case presents the question, one of first impression in this circuit, whether § 12132 of the ADA and the Department of Justice's integration regulation, 28 C.F.R. § 35.130(d), prohibit a state from confining a disabled individual in a state-run institution where that individual could be appropriately treated in a more integrated community setting. The State's principal argument is that the district court's application of § 12132 and its accompanying regulations is contrary to the ADA's requirement that a plaintiff prove that he or she faced discrimination "by reason of such disability." § 12132. The State contends that L.C. and E.W. have not shown that they were denied community placements available to non-disabled individuals because of disability. In other words, the State argues that the ADA requires a comparison of the treatment of individuals with disabilities against that of healthy non-disabled persons. However, as the State must concede, the confinement of L.C. and E.W. at GRH-A is attributable to their disabilities, thereby proving the very element the State argues is missing. Reduced to its essence, the State's argument is that Title II of the ADA affords no protection to individuals with disabilities who receive public services designed only for individuals with disabilities.

The State has not pointed to any legal authority that supports such a reading of Title II of the ADA and its integration regulation, § 35.130(d), and we can find none. To the contrary, we find

---

[3]The State also claims that it was entitled to summary judgment on plaintiffs' constitutional claims. Because the district court did not consider these claims, we decline to do so as well. *Citro Florida, Inc. v. Citrovale, S.A.,* 760 F.2d 1231, 1232 (11th Cir.1985).

overwhelming authority in the plain language of Title II of the ADA, its legislative history, the Attorney General's Title II regulations, and the Justice Department's consistent interpretation of those regulations, to support L.C. and E.W.'s position.

We analyze the applicability of the ADA and its regulations first by discussing the plain language of Title II of the ADA and § 35.130(d), the integration regulation, and the Attorney General's interpretation of that language. We then consider, in light of congressional intent, the State's argument that, notwithstanding the plain language of § 35.130(d) and the Attorney General's interpretation of that regulation, the ADA does not apply in these circumstances. We next address the State's secondary argument that certain disputed issues of fact preclude summary judgment. Finally, we consider the State's argument that funding limitations preclude it from complying with the ADA.

I.

Title II of the ADA prohibits discrimination against individuals with disabilities in the provision of public services by state and local governments. Section 12132 provides that "no qualified individual with a disability shall, by reason of his disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." § 12132.

Under the statutory scheme of Title II, Congress entrusted the Attorney General with the authority to define the scope of the prohibitions set forth in § 12132. In § 12134 of the ADA, Congress directed the Attorney General to promulgate regulations further defining Title II's anti-discrimination mandate. *See* 42 U.S.C. § 12134(a); H.R. Rep. 101-485, pt. 3 at 52 (1990) ("[T]itle II does not list all the forms of discrimination that the title is intended to prohibit. Thus, the purpose of this section is to direct the Attorney General to issue regulations setting forth the

forms of discrimination prohibited."). Congress additionally mandated that the Attorney General's regulations, except with regard to program accessibility, existing facilities, and communications issues, be "consistent with this chapter and with the coordination regulations under part 41 of title 28, Code of Federal Regulations ... applicable to recipients of Federal financial assistance under [section 504 of the Rehabilitation Act]." 42 U.S.C. § 12134(b).[4]

In response to this congressional mandate, the Attorney General issued regulations defining the forms of discrimination prohibited by Title II of the ADA. Because Congress left to the Attorney General the task of giving meaning to § 12132's broad prohibition on discrimination in public services, the Attorney General's regulations must be "given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. NRDC, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *Bledsoe v. Palm Beach County Soil & Water Conserv. Dist.,* 133 F.3d 816, 822-23 (11th Cir.1998); *Harris v. H & W Contracting Co.,* 102 F.3d 516, 521 (11th Cir.1996); *Helen L. v. DiDario,* 46 F.3d 325, 331-32 (3d Cir.1995).

Under the Attorney General's Title II implementing regulations, "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). There can be little question that the plain language of § 35.130(d) prohibits a state from providing services to individuals with disabilities in an unnecessarily segregated setting. *See* 28 C.F.R. Pt. 35, App. A at 478 (interpreting § 35.130(d) to require placement "in a setting that enables individuals with disabilities to interact

---

[4]Section 504 of the Rehabilitation Act, in turn, provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794(a) (Supp.1997).

with non-disabled persons to the fullest extent possible"). In participating in this and other similar litigation, the Attorney General has consistently adopted this interpretation of § 35.130(d), and, as such, it is entitled to substantial deference. *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 2386-87, 129 L.Ed.2d 405 (1994); *University Health Servs., Inc. v. Health & Human Servs.,* 120 F.3d 1145, 1150 (11th Cir.1997).

By definition, where, as here, the State confines an individual with a disability in an institutionalized setting when a community placement is appropriate, the State has violated the core principle underlying the ADA's integration mandate. Placement in the community provides an integrated treatment setting, allowing disabled individuals to interact with non-disabled persons—an opportunity permitted only in limited circumstances within the walls of segregated state institutions such as GRH-A. The State does not seriously contend otherwise. Nor does it even attempt to show that the Attorney General's interpretation is " "plainly erroneous or inconsistent with the regulation' " as it must to overturn her construction of § 35.130(d). *Thomas Jefferson,* 512 U.S. at 512, 114 S.Ct. at 2386 (quoting *Udall v. Tallman,* 380 U.S. 1, 16-17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)).

Because the express terms of § 35.130(d), supported by the Attorney General's consistent interpretation, plainly prohibit a state from treating individuals with disabilities in a segregated environment where a more integrated setting would be appropriate, we can only reverse the district court's finding that the State's actions in this case constituted discrimination within the meaning of the ADA by holding § 35.130(d) invalid. Thus, we turn to the State's argument that § 12132's requirement that a disabled plaintiff proved that he or she faced discrimination "by reason of such disability" precludes application of the ADA in the circumstances presented here.

II.

After review, we are unable to credit the State's argument that the ADA does not bar a state from providing public services for individuals with disabilities in a segregated manner because every indication of congressional intent confirms that the ADA applies to the circumstances presented here. As noted earlier, in passing the ADA, Congress mandated that the Attorney General promulgate regulations consistent with the coordination regulations issued pursuant to § 504 of the Rehabilitation Act. Congress' decision to incorporate the § 504 coordination regulations is particularly significant here. The Attorney General's § 504 coordination regulations mandate that recipients of federal financial assistance "administer programs and activities *in the most integrated setting appropriate to the needs of qualified handicapped persons.*" 28 C.F.R. § 41.51(d) (1997) (emphasis added). By requiring the Attorney General to follow the § 504 coordination regulations—including the explicit integration requirement—Congress expressly mandated that individuals with disabilities receive public services in the most integrated setting appropriate to their needs. Conforming to this mandate, § 35.130(d) tracks this very language.[5]

It is well-settled that where "a Congress that re-enacts a statute voices its approval of an administrative ... interpretation thereof, Congress is treated as having adopted that interpretation, and this Court is bound thereby." *United States v. Board of Comm'rs of Sheffield, Ala.,* 435 U.S. 110, 134, 98 S.Ct. 965, 980, 55 L.Ed.2d 148 (1978); *Don E. Williams Co. v. Commissioner,* 429 U.S. 569, 576-77, 97 S.Ct. 850, 855-56, 51 L.Ed.2d 48 (1977). Although Title II of the ADA did not re-enact § 504 of the Rehabilitation Act, the plain language of the ADA makes clear that Congress ratified the Attorney General's § 504 coordination regulations and sought to ensure that the Attorney

---

[5]In line with § 12134(b)'s mandate to promulgate regulations consistent with other parts of the ADA, the Attorney General's Title II regulations are also consistent with the provisions of Title III. *See* 42 U.S.C. § 12182(b)(1)(B) (1995) ("Goods, services, facilities, privileges, advantages, and accommodations shall be afforded to an individual with a disability in the most integrated setting appropriate to the needs of the individual.").

General's Title II regulations tracked the § 504 coordination regulations. Under these circumstances, both sets of regulations, including the integration provisions, have the force of law. *Helen L.,* 46 F.3d at 332; *Messier v. Southbury Training School,* 916 F.Supp. 133, 141 (D.Conn.1996).

Congress' determination that public services be provided in the most integrated setting appropriate to the needs of individuals with disabilities is likewise reflected in the ADA's congressional findings and the Act's legislative history. The Act's findings and legislative history make clear that Congress sought to eliminate the segregation of individuals with disabilities in passing the ADA. In enacting the ADA, Congress determined that discrimination against individuals with disabilities persists in a wide variety of areas of social life, including "institutionalization," 42 U.S.C. § 12101(a)(3) (1995), and that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion ... [and] segregation...." 42 U.S.C. § 12101(a)(5); *see also* 42 U.S.C. § 12101(a)(2) ("[H]istorically, society has tended to isolate and segregate individuals with disabilities, and ... such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.").

Indeed, the legislative history makes clear that Congress considered the provision of segregated services to individuals with disabilities a form of discrimination prohibited by the ADA. *See* S.Rep. No. 101-116 at 20 (1989) (noting "compelling need to provide a clear and comprehensive national mandate ... for the integration of persons with disabilities into the economic and social mainstream of American life"); H.R.Rep. No. 101-485, pt. 2 at 29 (1990) (listing "segregation" as a form of "[d]iscrimination against people with disabilities"); H.R. Rep. No. 101-485, pt. 3 at 26 (1990) ("The ADA is a comprehensive piece of civil rights legislation which promises a new future: a future of inclusion and integration, and the end of exclusion and segregation."). Noting that "[t]he purpose of Title II is to continue to break down barriers to the integrated participation of people with

disabilities in all aspects of community life," *id.* at 49-50, the House Committee on the Judiciary explained that "integrated services are essential to accomplishing the purposes of Title II.... Separate-but-equal services do not accomplish this central goal and should be rejected." *Id.* at 50. Indeed, drawing an analogy to the segregation of African-Americans, the House Report noted that "segregation for persons with disabilities "may affect their hearts and minds in a way unlikely ever to be undone.' " *Id.* at 26 (quoting *Brown v. Board of Educ.*, 347 U.S. 483, 494, 74 S.Ct. 686, 691-92, 98 L.Ed. 873 (1954)). Certainly, the denial of community placements to individuals with disabilities such as L.C. and E.W. is precisely the kind of segregation that Congress sought to eliminate.

Accordingly, because § 35.130(d) finds direct support in the plain language of the ADA, its congressional findings, and the Act's legislative history, we must apply it here. *See Bledsoe,* 133 F.3d at 823 (deferring to ADA's Title II regulations); *Harris,* 102 F.3d at 521 ("We cannot disregard the interpretive guidance contained in the appendix prepared by the federal agency charged with enforcing the ADA, when that guidance is based on a permissible construction of the statute and is supported by the statute's legislative history.").

We see nothing in the ADA's requirement that discrimination be "by reason of such disability" that warrants a different result. The fact that L.C. and E.W. seek community-based treatment services that only disabled persons need does not foreclose their claim that they were unnecessarily segregated. The ADA does not only mandate that individuals with disabilities be treated the same as persons without such disabilities. Underlying the ADA's prohibitions is the notion that individuals with disabilities must be accorded reasonable accommodations *not* offered to other persons in order to ensure that individuals with disabilities enjoy "equality of opportunity, full participation, independent living, and economic self-sufficiency ...." § 12101(a)(8); *see Willis*

*v. Conopco, Inc.,* 108 F.3d 282, 285 (11th Cir.1997) (describing "the basic goal of the ADA" as "ensuring that those with disabilities can fully participate in all aspects of society"). This principle, explicit in the text of the Act's employment provisions in Title I, *see* 42 U.S.C. § 12112(b)(5)(A) (1995), and the Title II regulations, runs throughout the ADA. *See Bledsoe,* 133 F.3d at 820-25 (applying Title I reasonable accommodation mandate to Title II).

For example, under Title I of the ADA, employers may not terminate individuals with known disabilities who can perform the essential functions of the job with a reasonable accommodation even though the employer need not offer similar accommodations to nondisabled employees. *See Harris,* 102 F.3d at 519 (noting that the ADA "operates to create an affirmative duty for employers to reasonably accommodate individuals with disabilities"); *see also Sieberns v. Wal-Mart Stores, Inc.,* 125 F.3d 1019, 1021-22 (7th Cir.1997) (noting that the "ADA encompasses two distinct types of discrimination": "treating a "qualified individual with a disability' differently because of the disability, i.e. disparate treatment" and "failing to provide a reasonable accommodation"). The employer's failure to live up to its duty to provide a reasonable accommodation is unlawful disability-based discrimination. *See Stewart v. Happy Herman's Cheshire Bridge,* 117 F.3d 1278, 1285 (11th Cir.1997) ("[A] qualified individual with a disability may be unlawfully discriminated against because of the individual's disability when the individual's employer does not reasonably accommodate the disability—unless such an accommodation would impose an undue hardship on the employer."); *see also Duckett v. Dunlop Tire Corp.,* 120 F.3d 1222, 1224 (11th Cir.1997) (noting that ADA defines discrimination to include failure to make reasonable accommodations to a qualified individual with a disability).

Here, the Attorney General, guided by Congress' explicit approval of the § 504 coordination regulations, imposed a duty analogous to the reasonable accommodation mandate in the employment

setting. This duty requires states to place individuals with disabilities in the most integrated setting appropriate to their needs when receiving services for their disabilities in order to ensure that they become integrated into communities, not isolated from the rest of our society in state-run institutions. Under § 35.130(d), the failure to provide the most integrated services appropriate to the needs of disabled persons constitutes unlawful disability-based discrimination—even though such services may not be needed by nondisabled individuals—because such segregation perpetuates their status as second-class citizens unfit for community life. As the Third Circuit explained in holding that the unnecessary segregation of disabled persons violates Title II of the ADA, "[t]he ADA is intended to ensure that qualified individuals receive services in a manner consistent with basic human dignity rather than a manner that shunts them aside, hides, and ignores them." *Helen L.,* 46 F.3d at 335; *see also City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 461-64, 105 S.Ct. 3249, 3265-67, 87 L.Ed.2d 313 (1985) (Marshall, J., concurring in part and dissenting in part) (surveying history of "segregation and discrimination" against mentally retarded persons).[6]

Further, the State's position is inconsistent with Congress' direction to promulgate regulations

_____

[6]Nothing in the Supreme Court's decision in *Traynor v. Turnage,* 485 U.S. 535, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988), is to the contrary. In *Traynor,* the Court held that § 504 of the Rehabilitation Act did not impliedly repeal an Act of Congress permitting veterans to delay using their "GI Bill" educational benefits past the statutory time limit because of a disability that was not the result of their own willful misconduct. In upholding the willful misconduct limitation, the Court found "nothing in the Rehabilitation Act that requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons," *id.* at 549, 108 S.Ct. at 1382-83, holding that Congress could choose to deny the benefit to veterans "because they engaged in some degree of wilfulness in the conduct that caused them to become disabled." *Id.* at 550, 108 S.Ct. at 1383. Here, the issue is not whether benefits accorded to one group of disabled persons must be extended to all others, without regard to the individual's responsibility for the conduct that caused the disability, but whether a State may provide services to individuals with disabilities in an unnecessarily segregated setting in the face of a clear congressional mandate requiring integrated services. Nothing in *Traynor* requires us to validate the unnecessary segregation at issue here. *See Helen L.,* 46 F.3d at 335-36; *Messier,* 916 F.Supp. at 142 n. 7; *Martin v. Voinovich,* 840 F.Supp. 1175, 1191 (S.D.Ohio 1993).

consistent with the § 504 coordination regulations. These regulations impose a duty to provide the most integrated services appropriate irrespective of any difference between services provided to individuals with disabilities and individuals without disabilities. Under the § 504 coordination regulations, no showing of differential treatment is required; the integration regulation, on its face, applies to all services provided by a public entity. Significantly, Congress did not require the Attorney General to follow other agency regulations that require integration only where differential treatment exists between individuals with disabilities and individuals without disabilities. *See* 45 C.F.R. § 84.4(b)(2) (1997) (Department of Health and Human Services) (requiring recipients of federal financial assistance from the agency to "afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement [as nonhandicapped persons], in the most integrated setting appropriate to the person's needs"); *see also* 34 C.F.R. § 104.4(b)(2) (1997) (same) (Department of Education). In making this choice, Congress decided that the unnecessary segregation of individuals with disabilities violates the ADA even absent a showing of differential treatment between individuals with disabilities and nondisabled persons. The State's position would effectively nullify Congress' choice to mandate the more demanding integration requirement contained in the § 504 coordination regulations.

Furthermore, a separate section of both the § 504 coordination regulations and the ADA Title II regulations prohibits a public entity from providing "different or separate" services to individuals with disabilities or a class of individuals with disabilities from those provided to other persons unless necessary to provide qualified disabled individuals with services "that are as effective as those provided to others." 28 C.F.R. § 35.130(b)(1)(iv); 28 C.F.R. § 41.51(b)(1)(iv). The State's claim that § 35.130(d) also requires a showing of differential treatment between disabled and nondisabled persons would render the prohibitions contained in § 35.130(b)(1)(iv) redundant—an

interpretation we must strive to avoid. *See Mackey v. Lanier Collection Agency & Serv., Inc.,* 486 U.S. 825, 837, 108 S.Ct. 2182, 2189, 100 L.Ed.2d 836 (1988) (declining "to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law"); *Cammarano v. United States,* 358 U.S. 498, 505, 79 S.Ct. 524, 529, 3 L.Ed.2d 462 (1959) (rejecting construction of regulation that would render a phrase "pure surplusage").

Moreover, the State's interpretation of Title II would undermine the congressional intent to end the exclusion and segregation of individuals with disabilities, as expressed in § 12101 and the ADA's legislative history. In light of Congress' recognition that "discrimination against individuals with disabilities persists in such critical areas as ... institutionalization," § 12101(a)(3), the State's interpretation of Title II runs directly counter to Congress' stated purposes and must be rejected. *See McNely v. Ocala Star-Banner Corp.,* 99 F.3d 1068, 1074 (11th Cir.1996) (rejecting interpretation of the ADA because it "cannot be reconciled with ... [the Act's] stated purpose"), *cert. denied,* --- U.S. ----, 117 S.Ct. 1819, 137 L.Ed.2d 1028 (1997). As the Third Circuit pointed out in *Helen L.,* "[i]f Congress were only concerned about disparate treatment of the disabled as compared to their nondisabled counterparts, this statement would be a non sequitur as only disabled persons are institutionalized." 46 F.3d at 336.

Further, while the State did not deny L.C. and E.W. community-based placements out of a malevolent intent to segregate them from the community, their indifference to L.C.'s and E.W.'s needs—manifested by their refusal to place them in the community while recognizing the propriety of such a placement—is exactly the kind of conduct that the ADA was designed to prevent. In *Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), surveying the legislative history of the Rehabilitation Act, the precursor of the ADA, the Supreme Court explained that Congress sought to do far more than merely outlaw invidious discrimination against the

handicapped.

> Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect. Thus, Representative Vanik ... described the treatment of the handicapped as one the country's "most shameful oversights," which caused the handicapped to live among society "shunted aside, hidden, and ignored." ... Federal agencies and commentators on the plight of the handicapped similarly have found that discrimination against the handicapped is primarily the result of apathetic attitudes rather than affirmative animus.

*Id.* at 295-96, 105 S.Ct. at 717 (footnotes omitted) (citations omitted). Indeed, Justice Marshall's opinion for the Court made clear that "much of the conduct that Congress sought to alter in passing the Rehabilitation Act would be difficult if not impossible to reach were the Act construed to proscribe only conduct fueled by a discriminatory intent." *Id.* at 296-97, 105 S.Ct. at 718. These same concerns underlie the ADA. "[T]he ADA attempts to eliminate the effects of that "benign neglect,' "apathy,' and "indifference.' " *Helen L.,* 46 F.3d at 335; *see also* H.R.Rep. No. 101-485, pt. 3 at 50, U.S.Code Cong. & Admin.News 1990 at pp. 267, 473 (" "[T]he goal is to eradicate the invisibility of the handicapped.' ") (quoting *ADAPT v. Skinner,* 881 F.2d 1184, 1204 (3d Cir.1989) (en banc) (Mansmann, J, concurring in part and dissenting in part)). The State's failure to place L.C. and E.W. in the community thus falls squarely within the ADA's ban on disability-based discrimination.

Nor do any of the cases cited by the State require a different conclusion. The State relies heavily on our *en banc* decision in *S.H. v. Edwards,* 886 F.2d 292 (11th Cir.1989) (en banc), as well as several cases decided by other Circuits, *see P.C. v. McLaughlin,* 913 F.2d 1033 (2d Cir.1990); *Clark v. Cohen,* 794 F.2d 79 (3d Cir.1986); *Phillips v. Thompson,* 715 F.2d 365 (7th Cir.1983). But nothing in *S.H.* or these other cases remotely touches on the issues presented by this appeal.

While it is true that we generally look to Rehabilitation Act precedents in construing the ADA, *see Duckett,* 120 F.3d at 1225 n. 1, none of the cases cited by the State involved claims under

the express integration regulation of either the ADA or the § 504 coordination regulations, and therefore, those cases are inapposite here. *See Helen L.,* 46 F.3d at 333-34 (distinguishing prior Rehabilitation Act precedent on this ground).

In *S.H.,* for example, we considered " "plaintiffs' claims for relief in the nature of habilitation in the least restrictive environment in accordance with the recommendation of professional treatment staff.' " *S.H.,* 886 F.2d at 293. *S.H.* did not involve the integration regulation of either § 504 of the Rehabilitation Act or the ADA, or a claim that plaintiffs had been unnecessarily segregated. Instead, plaintiffs' only statutory claim was that they had been impermissibly denied habilitation reviews. The district court denied this claim, finding that the legislature's use of a chronological bright-line to trigger habilitation reviews did not evidence discrimination solely because of disability. *See S.H. v. Edwards,* 860 F.2d 1045, 1052 (11th Cir.1988) (district court opinion attached as appendix A). It is far from clear whether our two paragraph en banc decision even considered plaintiffs' Rehabilitation Act claim.

Finally, we also reject the State's suggestion that L.C.'s and E.W.'s ADA claim must fail because the denial of community-based placements was based on a lack of funds, not on L.C.'s and E.W.'s disabilities. Under the ADA, as under Title VII of the Civil Rights Act, "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy ...." *International Union, UAW v. Johnson Controls,* 499 U.S. 187, 199, 111 S.Ct. 1196, 1203-04, 113 L.Ed.2d 158 (1991). Even if the State failed to place L.C. and E.W. in the community because of a lack of funding, this motive does not lessen the "discriminatory character" of their segregation. *Id.* Moreover, the plain language of the ADA's Title II regulations, as well as the ADA's legislative history, make clear that Congress wanted to permit a cost defense only in the most limited of circumstances. The ADA's Title II regulations permit a state to justify its failure to make reasonable

accommodations for individuals with disabilities where those accommodations "would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. 35.130(b)(7).[7] As the House Judiciary report explained,

> The fact that it is more convenient, either administratively or fiscally, to provide services in a segregated manner, does not constitute a valid justification for separate or different services under Section 504 of the Rehabilitation Act, or under this title.... The existence of such programs can never be used as a basis to ... refuse to provide an accommodation in a regular setting.

H.R.Rep. No. 101-485, pt. 3 at 50, U.S.Code Cong. & Admin.News 1990 at 473. The State's argument that its lack of funds makes its refusal to provide integrated services non-discriminatory is inconsistent with the ADA's statutory scheme and would permit a public entity to justify its refusal to comply with the ADA by asserting that it lacked the money to do so.

We emphasize that our holding does not mandate the deinstitutionalization of individuals with disabilities. Instead, we hold that where, as here, a disabled individual's treating professionals find that a community-based placement is appropriate for that individual, the ADA imposes a duty to provide treatment in a community setting—the most integrated setting appropriate to that patient's needs. Where there is no such finding, on the other hand, nothing in the ADA requires the deinstitutionalization of that patient.

III.

The State also argues that the district court erred in granting summary judgment to E.W. because there is a disputed issue of fact regarding whether E.W. could be placed in a community-based treatment program. We review the district court's grant of summary judgment de novo, applying the same standards as the district court. *Harris,* 102 F.3d at 518. Summary judgment is appropriate if the pleadings, depositions, and affidavits show that no genuine issue of

---

[7]We consider the applicability of this defense in part IV.

material fact exists for trial and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). We must view all evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Harris,* 102 F.3d at 519.

The State concedes that, at times during the course of this litigation, its own experts found that E.W. could be placed in a community treatment program. However, it claims that because, at other times, those experts maintained that E.W. should receive treatment in an institutionalized setting, a genuine issue of material fact exists as to whether community-based treatment was a possibility for E.W. In particular, the State points to the statements of Dr. Gary DeBacher, the chief of the Psychology staff at GRH-A, Joseph Steed, a behavioral specialist with the Fulton County Regional Board, and Gloria Sheppard, a member of the Board's Comprehensive Evaluation Team. As the State argues, these experts found that E.W. could not be placed in the community at certain times during this litigation. At the same time, however, these experts testified that a community-based placement would be appropriate for E.W. once her condition improved, so long as the community treatment program provided her with the necessary level of care and supervision.[8]

In light of the testimony and considering the record as a whole, we reject the State's argument that the district court's grant of summary judgment was in error. All the experts, including E.W.'s treating physician, were unanimous that E.W. could be appropriately placed in a community-based

---

[8]The State also points to E.W.'s hospitalization at the Central State Hospital in Milledgeville, Georgia and at Grady Memorial Hospital in Atlanta in late 1996 to support the conclusion that E.W. could not be placed in the community. At that time, E.W.'s kidney functions were compromised, requiring surgery in the hospital. Although prior to the surgery, one of the State's experts, Dr. George Echols, was uncertain whether E.W. could be placed in the community after the surgery, the surgeon who performed the operation testified after the surgery that E.W.'s medical problems did not require her to remain in a state hospital.

treatment program, provided that it could give E.W. the level of care and supervision she needed.[9] The State has not suggested that such placements were not available to E.W. Indeed, they were able to find such a placement for E.W. after the district court's judgment.

We do not suggest that should a trial court find that a patient, for medical reasons, needs institutionalized care, it must nonetheless order placement in a community-based treatment program. We recognize that the determination whether a patient can be appropriately placed in a community-based treatment program is a fluid one, subject to change as the patient's medical condition improves or worsens. Over the course of litigation, there may be times that a patient can be treated in the community, and others where an institutional placement is necessary. But where, as here, the evidence is clear that all the experts agree that, at a given time, the patient could be treated in a more integrated setting, the ADA mandates that it do so at that time unless placing that individual would constitute a fundamental alteration in the state's provision of services. Nothing in the ADA, however, forbids a state from moving a patient back to an institutionalized treatment setting, as the patient's condition necessitates.

Under these principles, the district court correctly denied the State's motion for summary judgment. Summary judgment is not precluded here by the fact that, at earlier times in the litigation, some of the State's experts opined that E.W. could not be placed in the community immediately. None of the State's experts concluded that E.W. needed to be placed at GRH-A on a long-term basis. At most, they believed that, in the short term, continued hospitalization was necessary in order to permit E.W. to make the transition to a community-based living arrangement in a group home.

_____

[9]In early 1995, the experts at GRH-A themselves recognized that E.W. could be placed outside GRH-A. They repeatedly placed her in personal care homes, providing her with a community setting for her treatment. She was not placed, however, in a community setting with the appropriate level of monitoring, and, as a result, she returned to GRH-A after extremely short stays in the community.

Although one of the State's experts, Joseph Steed, expressed concerns that E.W. would not progress to the point where she could be placed in the community, the evidence in the record shows that, in the spring and summer of 1996—after Steed's initial assessment as well as the others cited by the State—GRH-A attempted to find a community placement for E.W., but could not because there were no available state Medicaid waiver funds for such a placement.

Accordingly, because the State's own professionals agreed that E.W. could be placed in a less segregated setting, the State has failed to demonstrate that there is a material issue of fact for trial as required by Fed.R.Civ.P. 56. Accordingly, the grant of summary judgment was not in error.

IV.

In Part II we rejected the State's argument that it complied with the ADA in this case because the denial of community placements to L.C. and E.W. was based on the State's lack of funds, not on plaintiffs' disabilities. We must now address whether the lack of available funding provides the State a defense to plaintiffs' ADA claim.

Notwithstanding that under the ADA and its Title II regulations the State has a duty to provide integrated services when the patient's care warrants such services, that duty is not absolute. As discussed above, the State need not provide these services if to do so would require a fundamental alteration in its programs. Under Title II, "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

L.C. and E.W. have demonstrated that the State may reasonably modify its provision of services by providing treatment to them in an integrated setting. L.C. and E.W. point out that, under

Georgia law, the State has the authority to transfer funds between institutional and community-based treatment programs based on need. O.C.G.A. § 37-2-5.1(c)(3) (1995). They also note that, under the federal government's Medicaid waiver program, the State may spend Medicaid funds to provide community-based care to disabled persons who would otherwise be eligible for institutionalized care. The federal government has authorized matching federal dollars for over 2100 patients in Georgia, but, in 1996, the State used only 700 of these slots. *See* Hopkins Dep. at 18-19. Finally, they argue that the State can provide integrated community-based services at significantly less cost than institutionalized care.

The availability of these alternate sources of funding makes L.C.'s and E.W.'s request for modification of the State's program of providing services to disabled persons a reasonable one " "in the run of cases.' " *Willis,* 108 F.3d at 286 n. 2 (quoting *Barth v. Gelb,* 2 F.3d 1180, 1187 (D.C.Cir.1993)). Accordingly, it is the State's duty to demonstrate that providing treatment to L.C. and E.W. fundamentally alters the nature of the service it provides " "in the context of the particular agency's operations.' " *Id.; Helen L.,* 46 F.3d at 337; H.R.Rep. No. 101-485, pt. 3 at 51 (noting importance of "size and budget" of the particular agency).

The State does not argue that the relief requested by L.C. and E.W. will effect a fundamental alteration by requiring it to dismantle its provision of institutionalized care to individuals with disabilities. Instead, the State argues that it lacks the funds to provide community-based services to L.C. and E.W. The district court rejected this argument, reasoning that the State could provide community-based services to L.C. and E.W. at less cost than providing institutional care for them at GRH-A. Accordingly, it found that the State's purported lack of funds to provide community-based services to L.C. and E.W. was insufficient as a matter of law to establish that providing community-based care to plaintiffs would constitute a fundamental alteration.

Under the ADA, as with other federal statutes, "[i]nadequate state appropriations do not excuse noncompliance" with federal law. *Alabama Nursing Home Ass'n v. Harris,* 617 F.2d 388, 396 (5th Cir.1980) (Medicaid Act); *see also Doe v. Chiles,* 136 F.3d 709 (11th Cir.1998) (same); *Tallahassee Memorial Regional Med. Ctr. v. Cook,* 109 F.3d 693, 704 (11th Cir.1997) (same). Having chosen to provide services to individuals with disabilities, the State—both the state officials charged with formulating the budget as well as the state agencies responsible for mental health services—must act "in a manner [that] comports with the requirements of [the ADA]." *Helen L.,* 46 F.3d at 339.

Our cases make clear that the ADA does not permit the State to justify its discriminatory treatment of individuals with disabilities on the grounds that providing non-discriminatory treatment will require additional expenditures of state funds. We recognized this principle in *United States v. Board of Trustees for University of Alabama,* 908 F.2d 740 (11th Cir.1990). There, we held that, considering the size of the University of Alabama's transportation budget, the University failed to show that an additional expenditure of $15,000 to modify its bus system to reasonably accommodate individuals with disabilities would impose an undue financial hardship. The University could not simply claim that it lacked the funds to make these modifications in its bus system; rather it could only justify its discriminatory treatment by demonstrating that its transportation budget could not be reasonably modified to take account of the needs of the disabled. In light of its "annual transportation budget of $1.2 million," we concluded that requiring minimal additional expenditures of $15,000 would not "cause an undue financial burden on UAB." *Id.* at 751.

The district court did not consider whether treating L.C. and E.W. would require additional expenditures and if so, whether the State had met its burden of proving that those expenditures were unreasonable in light of the State's mental health budget. Instead, it noted that the State currently

provided community-based services to individuals with disabilities and that such services could be provided at less cost than segregated services. Based on these two factors, the district court concluded that the State had failed to show that providing community-based care to L.C. and E.W. would cause an fundamental alteration.

There is evidence in the record that suggests that, because of fixed overhead costs associated with providing institutional care, the State will be able to save money by moving patients from institutionalized care to community-based care only when it shuts down entire hospitals or hospital wings, but not when it moves one or two patients from a hospital into the community. *See* Olmstead Dep. at 78-80; Bliss Dep. at 33-34. Thus, it may be that requiring the State to treat L.C. and E.W. in a community-based program will require additional expenditure of state funds.

Nonetheless, the ADA may still require the State to expend additional funds in order to provide L.C. and E.W. with integrated services. Unless the State can prove that requiring it to make these additional expenditures would be so unreasonable given the demands of the State's mental health budget that it would fundamentally alter the service it provides, the ADA requires the State to make these additional expenditures. Because the district court did not consider this question and because of the complexity of the factual issues concerning the funding for mental health services in Georgia, we remand this case to the district court for further proceedings on this issue. In determining whether the State can meet its burden of establishing a fundamental alteration, the district court should consider, among other things: (1) whether the additional expenditures necessary to treat L.C. and E.W. in community-based care would be unreasonable given the demands of the State's mental health budget; (2) whether it would be unreasonable to require the State to use additional available Medicaid waiver slots, as well as its authority under Georgia law to transfer funds from institutionalized care to community-based care, to minimize any financial

burden on the State;  and (3) whether any difference in the cost of providing institutional or community-based care will lessen the State's financial burden.[10]  This list, is, of course, not exclusive.  The district court may also consider any other factors it believes are relevant to the fundamental alteration inquiry.

Accordingly, the judgment of the district court is AFFIRMED and the case is REMANDED for further proceedings consistent with this opinion.

---

[10]We note that this case is not a class action, but a challenge brought on behalf of two individual plaintiffs.  Our holding is not meant to resolve the more difficult questions of fundamental alteration that might be present in a class action suit seeking deinstitutionalization of a state hospital.