Heartz v. Morton                    CV-98-317-B    02/24/99

**UNITED STATE DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Bruce Heartz

   v.                                    Civil No. 98-317-B

Terry Morton, et. al.


## O R D E R


     Defendant Terry Morton[1], in his capacity as Commissioner of the State of New Hampshire Department of Health and Human Services, brought a Motion to Correct Clerical Error, noting that the stated allocation of Medicaid costs between the State and the counties for long-term care (30 percent state and 20 percent county) is incorrect as set forth in my Order of January 8, 1999. I agree.

    Defendant requests that I correct this clerical error to reflect the cost allocation (30 percent county and 20 percent state) stated in N.H. Rev. Stat. Ann. 167:18-b (Cum. Supp. 1998). The statutory allocation of Medicaid costs between the state and the counties for long-term care, however, was recently amended to equal shares of 25 percent between state and county, see 1999 N.H. Laws, Ch. 388 (adopted Sept. 26, 1998, effective Jan. 1, 1999)(amending N.H. Rev. Stat. Ann. 167:18-b to require counties to reimburse the state "50 percent of the non-federal share," or

---

[1]  Donald Shumway replaced Terry Morton as Commissioner of the State of New Hampshire Department of Health and Human Services in February 1999.

25 percent).  Because the effective date for the new cost allocation passed prior to the issuance of my January 8, 1999 order, I amend that order to reflect the recent change in the law.

Although the new cost allocation results in minor numerical changes in my analysis, it does not affect my ultimate decision to deny plaintiff's request for a preliminary injunction.

Accordingly, defendants' motion is GRANTED in part, and DENIED in part.  A copy of the amended order reflecting the relevant changes is attached.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

February    , 1999

cc:  Ronald K. Lospennato, Esq.
     Suzanne M. Gorman, Esq.

**UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


**Bruce Heartz**

v.                                          Civil No. 98-317-B

**Terry Morton, et. al.**


**AMENDED
MEMORANDUM AND ORDER**


Bruce Heartz, a Medicaid recipient with an acquired brain disorder, brings this action for declaratory and injunctive relief against the state officials who administer New Hampshire's Medicaid program. Heartz argues that the state's failure to treat him in a community setting violates his right under the Americans with Disabilities Act, 42 U.S.C. § 12132 *et. seq.* ("ADA"), to receive Medicaid services in the most integrated setting appropriate to his medical needs. Defendants assert that the ADA does not authorize the relief Heartz seeks because it would force the state to "fundamentally alter" its program for providing Medicaid services to individuals with brain disorders. I evaluate the parties' competing claims in ruling on Heartz's request for a preliminary injunction.

-3-

## A.   Plaintiff's Physical Condition

Heartz has multiple sclerosis ("MS"), an acquired brain disorder. The symptoms associated with MS vary from person to person and generally worsen over time. Heartz has lost the use of his legs and has only limited use of his arms and hands. He uses a wheelchair and requires two aides and a mechanical lift to move him in and out of bed. He needs assistance with all of his daily activities, including feeding, grooming, and personal hygiene. His body temperature, nutrition, skin integrity, and bowel movements must be monitored. He has a chronic superpubic catheter that requires irrigation and 24-hour supervision. Heartz also suffers from depression and certain cognitive limitations. His memory is impaired, although he still occasionally recognizes friends and family. His condition is unlikely to improve.

Heartz lives in a nursing home in Concord, New Hampshire. He receives all necessary medical care and treatment and shares a small semi-private room with another person. He pays a portion of his care costs and the remaining costs are paid by Medicaid. On May 19, 1998, the Merrimack County Probate Court found Heartz incompetent and appointed his brother, Robert Heartz, to serve as

his legal guardian. The parties agree that a program could be developed to allow Heartz to receive treatment in a community setting, although the cost of such a program remains in dispute.

B.   **The Medicaid Program**

Medicaid is the primary federal program for providing medical care to the poor. States that elect to participate in the program initially pay the entire cost of services provided under the program but later obtain partial reimbursement from the federal government. Participating states must submit a "State Plan" to the Secretary of the Health Care Financing Administration ("HCFA") demonstrating compliance with the Medicaid Act. See 42 U.S.C. § 1396a.

The Medicaid Act identifies certain medical services that a participating state must provide to eligible individuals and lists other elective services. See 42 U.S.C. § 1396a(a)(10)(A); see also 42 C.F.R. §§ 440.210(b), 440.220(a)(3). Among the services that a participating state must provide are "home health services." 42 U.S.C. § 1396a(a)(10)(D). These services "are provided to a recipient at his place of residence . . . on his physician's orders as part of a written plan of care." 42 C.F.R. § 440.70(a). They include: (1) part-time or intermittent nursing services; (2) home health aide services; and (3) medical

supplies, equipment, and appliances.  42 C.F.R. § 440.70(b).
A state may also elect to include physical therapy, occupational
therapy, and speech pathology services as home health services.
§ 440.70(b)(4).  The Medicaid Act draws a distinction between
"home health services," which a state must make available to
qualifying individuals, and "home and community-based services,"
which ordinarily cannot be paid for with Medicaid funds.  See 42
U.S.C. 1396n(c); 42 C.F.R. § 440.180.  Home and community-based
services include a variety of services that otherwise are not
covered by Medicaid but which a recipient may need to avoid
institutionalization such as: (1) case management services; (2)
homemaker services; (3) home health aide services; (4) personal
care services; (5) adult day health services;(6) habilitation
services; (7) respite care services; and (8) day treatment and
other partial hospitalization services.  See 42 C.F.R. § 440.180.
The parties agree that Heartz requires home and community-based
care services in order to move from the nursing home into the
community.

The Medicaid Act also imposes "state-wideness" and
"comparability" requirements on services provided pursuant to a
state plan.  In other words, a state's Medicaid plan must provide
that services provided by the plan "shall be in effect in all

political subdivisions of the state," 42 U.S.C. §1396a(a)(1), and "shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual." 42 U.S.C. § 1396a(a)(10)(B)(i). These requirements prevent a participating state from providing Medicaid benefits to a single individual or to a group of individuals without offering comparable benefits to all eligible individuals within the state.

C. **Medicaid Waiver Programs**

The Medicaid Act authorizes the Secretary of HCFA to waive the Act's requirements in specified circumstances to permit states to "try new or different approaches to efficient and cost-effective delivery of health care services, or to adapt their programs to the special needs of particular groups or recipients." 42 C.F.R. § 430.25(b). Specifically, the Act authorizes the Secretary to issue waivers for programs providing home and community-based care to individuals who otherwise would require institutionalization. See 42 U.S.C. § 1396n(c); 42 C.F.R. § 441.300 *et seq.* To obtain the Secretary's approval for a home and community-based care waiver, the state seeking the waiver must demonstrate that its average per capita expenditures for persons receiving benefits under the waiver do not exceed the average estimated per capita cost of providing Medicaid services

to the same group of individuals in an institutional setting. See 42 U.S.C. § 1396n(c)(2)(D). Any failure to abide by this requirement will result in the termination of the waiver. See 42 U.S.C. § 1396n(f)(1).

**D.   New Hampshire's Waiver Program For Individuals With Acquired Brain Disorders**

New Hampshire has obtained approval from HCFA to operate a home and community-based care waiver program for a select group of Medicaid recipients with acquired brain disorders (the "ABD waiver program"). The state applied for the waiver because many of the state's brain-injured Medicaid recipients formerly were treated in out-of-state institutions, at a greater-than-necessary expense and considerable inconvenience to the residents and their families. In a letter accompanying its proposal for the program, the state anticipated that the program would: (1) provide for a more cost-effective use of existing Medicaid funds; (2) provide appropriate service alternatives and choices to head injury survivors and their families; (3) provide linkages for the survivors and their families with regional service agencies; (4) allow survivors to return home to their families, if appropriate and desired, with supportive medical and personal care services; and (5) allow Medicaid funds to pay for services within New Hampshire.

Because the ABD waiver program qualifies as a "model" program under Medicaid regulations, it is limited to a maximum of 200 recipients at any one time.  See 42 C.F.R. § 441.305(b).  New Hampshire has determined, however, that it cannot serve 200 recipients and remain in compliance with the requirements of the ABD waiver program.  Accordingly, it has obtained approval from HCFA to admit 74 recipients and it has placed an additional 65 waiver candidates on a waiting list.  The state has developed a set of priority guidelines to determine each applicant's relative position on the waiting list.  Applicants are placed by the guidelines into one of the following five categories:

**PRIORITY 1-A:**

- The person is at substantial risk of significant physical or emotional harm due to lack of medical care, food, shelter, and adequate support
- The person is at risk of significant regression in functioning without the provision of services and supports
- The person is inflicting or is at substantial risk of inflicting physical or emotional harm toward self or others

**PRIORITY 1-B:**

- The person is a New Hampshire resident and resides in a nursing facility in another state paid by New Hampshire Medicaid

**PRIORITY 2:**

- The person is at risk of placement in a highly restrictive facility
- The person is inappropriately placed in a highly restrictive congregate facility, such as a hospital or nursing facility

**PRIORITY 3:**

- The person's current community placement is not the least restrictive to meet the individual's needs
- The person's current services are not of the type, quality or quantity to sufficiently meet the person's needs

**PRIORITY 4:**

- Alternative services are desired or necessary for any other reason

**PRIORITY 5:**

- The person lives outside New Hampshire and is not a New Hampshire Medicaid recipient

Of the 65 people on the waiting list, 14 are currently classified at "Priority 1-A" and seven others are listed as "Priority 1-B." Twenty-three individuals, including Heartz, have been assigned to the waiting list as "Priority 2" candidates. Although Heartz has been on a waiting list since April 1995, at least six candidates ranked ahead of Heartz have been waiting longer - some for as long as six years.

## E.    The Cost Of Plaintiff's Care

The Medicaid Act requires participating states to initially pay 100 percent of all properly filed Medicaid claims. HCFA then reimburses each state according to the state's "match rate" - a state-by-state calculation made by HCFA based on the state's per capita income. Using this formula, the federal government reimburses New Hampshire at the minimum match rate of 50 percent. Until recently, the state also received an additional 30 percent reimbursement from the county in which the recipient resided if

the recipient was receiving treatment in an institutional setting. N.H. Rev. Stat. Ann. § 167:18-b (Cum. Supp. 1998). Thus, the state ultimately paid only 20 percent of the Medicaid costs incurred by individuals who received services in institutions, but 50 percent of the Medicaid costs incurred by recipients who received community-based care. In 1997, Heartz's institution-based care costs totaled $43,379.28. Of this amount, Heartz paid $15,288 from his own funds. Pursuant to federal and state laws operating at the time, the federal government paid 50 percent of the balance, or $14,045.64; the county paid 30 percent, or $8,427.38; and the state paid 20 percent, or $5,618.26. Beginning on January 1, 1999, however, county and state shares were equalized at 25 percent each. See 1999 N.H. Laws Ch. 388 (effective January 1, 1999).

The parties have submitted various proposals to provide Heartz with care in a community-based setting. The state estimates that the total cost of treating Heartz in a community setting would be $154,778. Proposals submitted by Easter Seals and the Community Resources Council of New Hampshire estimate the total annual cost of serving Heartz's needs in the community at $154,576 and $116,597, respectively. Heartz meanwhile has produced a proposal from Residential Resources, Inc. which cites

anticipated costs of $72,755.33 per person if Heartz were to be placed in a three-person community-based group home.

## II.

### A. The Preliminary Injunction Standard

To obtain a preliminary injunction, a plaintiff must demonstrate: (1) that he is likely to succeed on the merits of his claim; (2) that he will suffer irreparable injury if the injunction is not granted; (3) that such injury outweighs the hardship that will be inflicted on the defendant by the granting of the injunction; and (4) that the public interest will not be adversely affected by the granting of the injunction. See DeNovellis v. Shalala, 135 F.3d 58, 62 (1st Cir. 1998); Gately v. Massachusetts, 2 F.3d 1221, 1224 (1st Cir. 1993). Since likelihood of success is the *"sine qua non"* of the preliminary injunction standard, see Gately, 2 F.3d at 1224, I focus my analysis on this requirement.

## III.

### A. The Integration Regulation And The Fundamental Alteration Defense

Title II of the ADA addresses disability discrimination by

public entities.  See generally 42 U.S.C. § 12131 *et seq.*

Section 202 of Title II provides in pertinent part that:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.[2]

The ADA directs the Attorney General to promulgate regulations to implement Title II, see 42 U.S.C. § 12134(a). Pursuant to this grant of power, the Department of Justice ("DOJ") has adopted an "integration regulation" mandating that "public entit[ies] shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. 35.130(d).  This requirement has been interpreted to prohibit state agencies from providing benefits to the disabled in unnecessarily segregated settings.  See, e.g., Zimring v.

_____

[2] The term "public entity" is defined in the statute as "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government . . . ."  42 U.S.C. § 12131(1). Defendants concede that the New Hampshire Department of Health and Human Service ("NHDHHS"), which administers the state's Medicaid program, qualifies as a public entity under the ADA.

<u>Olmstead</u>, 138 F.3d 893, 904 (11th Cir. 1998), <u>cert. granted</u>, 67 U.S.L.W. 3288(U.S. Dec. 17, 1998) (amended) (No. 98-536); <u>Helen L. v. DiDario</u>, 46 F.3d 325, 337 (3d Cir. 1995).

The mandate imposed by the integration regulation is not absolute.  Claims based on the regulation are subject to an affirmative defense if a defendant "can demonstrate that making the modifications [required by the regulation] would <u>fundamentally alter</u> the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7) (emphasis added), <u>see</u> <u>Zimring</u>, 138 F.3d at 904; <u>Helen L.</u>, 46 F.3d at 337.  Among the factors that a court should consider in determining whether a proposal for further integration would fundamentally alter a state program providing benefits to the disabled are:

> (1) whether the additional expenditures necessary to treat [the patient] in community-based care would be unreasonable given the demands of the State's mental health budget;(2) whether it would be unreasonable to require the State to use additional available Medicaid waiver slots, as well as its authority [if any, under state law] to transfer funds from institutionalized care to community-based care to minimize any financial burden on the State; and (3) whether any difference in the cost of providing institutional or community-based care will lessen the State's financial burden.

Zimring, 138 F.3d at 905.

Defendants do not challenge Heartz's claim that he is disabled and therefore is entitled to protection under the ADA. Nor can they credibly dispute his contention that he is not currently receiving Medicaid benefits in the most integrated setting appropriate to his medical needs. Accordingly, I turn to defendants' argument that the relief Heartz seeks should not be granted because it would fundamentally alter the operation of the ABD waiver program.

**B.    Application Of The Integration Regulation And The Fundamental Alteration Defense To The ABD Waiver Program**

Defendants argue that an order compelling Heartz's admission into the ABD waiver program would fundamentally alter the program by unreasonably increasing the state's cost of treating Heartz and by requiring the state to dramatically alter its established priorities for determining who should be admitted into the program. Heartz challenges defendants' contention that it will cost significantly more to treat him in a community setting. Thus, I examine this issue first.

1.  **The cost of treating Heartz in a community-based setting.**

Heartz claims that a proposal prepared by Residential Resources, Inc. provides the most reliable estimate of the cost of treating him in a community-based setting. This proposal contemplates that Heartz will be placed in a group home with two other unidentified individuals at a cost of $72,755.33 per person. There are several flaws with the proposal, however, that prevent me from accepting it as a reliable estimate of Heartz's treatment costs. First, while it is conceivable that the cost of caring for Heartz in a community setting could be reduced by placing him in a group home with other disabled individuals, the Residential Resources proposal achieves a lower per-person cost of treatment than the other proposals primarily by shifting costs attributable to Heartz onto the other unidentified occupants of the home whose treatment needs presumably will be less intensive than Heartz's.[3] Second, the proposal is based on a number of

_____

[3] To illustrate how the Residential Resources proposal could achieve a $72,755.33 average cost per person even though the actual cost of treating Heartz might be much higher, assume that Heartz's actual treatment costs in a group home would be $116,597.19 as has been suggested by the Community Resources Council of New Hampshire. If Heartz were placed in a group home with two disabled residents whose treatment costs were each $50,834.40, the average cost of treating all three residents would be the $72,755.33 estimated by Residential Resources even though the actual cost of treating Heartz would be much higher.

dubious assumptions about the actual cost of the services that Heartz will require. The proposal assumes that a three-bedroom, handicapped accessible home is available in the Concord area for an annual rent of $11,400. When pressed on this issue during the preliminary injunction hearing, however, plaintiff's counsel admitted that no such home had been found. The proposal also assumes that two Medicaid qualified roommates could be found with considerably less costly treatment needs than Heartz's, although no such individuals have been identified. Finally, the proposal significantly underestimates the actual cost of essentials such as food and utilities. For all of these reasons, the Residential Resources proposal is an unreliable estimate of the costs of treating Heartz in the community.

The record contains several other proposals with costs that vary between $116,597.19 and $154,778.00. Of these proposals, the $116,597.19 estimate submitted by the Community Resources Council of New Hampshire appears to be the most realistic. This proposal involves placing Heartz in an existing group home in Franklin, New Hampshire. The fact that this group home is currently operational, and that the proposed budget for

---

It appears from the record that Residential Resources has developed a lower cost estimate than other proposals primarily by using this cost shifting approach.

plaintiff's treatment is so thorough and based largely on known costs leads me to give this cost estimate greater credibility. Accordingly, for purposes of analysis, I will assume that this proposal provides the best estimate of the cost of treating Heartz in a community setting.

Under the new court allocation, if Heartz remains in a nursing home, the state will recover 50 percent of the cost of caring for Heartz from the federal government, and an additional 25 percent from the county. If Heartz is moved into community-based care, however, the state will lose the county contribution and be required to pay the entire 50 percent of the costs not covered by federal funds. In the present case, Heartz's Medicaid reimbursement at the nursing home totaled $28,091.28 in 1997, of which 20 percent[4], or $5,618.26, was paid by the state. Comparing the state's current costs with the $116,597.19 estimate developed by the Community Resources Council reveals the problem at the heart of this case. Of this $116,597.19, Heartz would pay $15,288 and 50 percent of the balance, or $50,654.60, would be paid from federal funds. Because the Community Resources plan is for community-based care, the state will receive no contribution

_____

[4] This calculation took place prior to the January 1, 1999 change which amended the state-county funding allocation to 25 percent each.

from the county, so the remaining 50 percent of the expense, also $50,654.60, would be the state's exclusive responsibility. Even after the 1999 amendments, which increased the state's institution-based cost allocation to 25 percent, it will cost the state $43,631.78 more per year to place Heartz in community-based care with the Community Resources Council than it will cost to continue to care for him in a nursing home.[5] Accordingly, I am not persuaded by Heartz's contention that the added cost of treating him in a community setting is either insignificant or reasonable. See Zimring, 138 F.3d at 905.

### 2) The state's priority system for admission into the ABD waiver program.

In addition to burdening the state with an additional $43,631.78 per year for his community-based care, the relief Heartz proposes would also require the state to alter its system for prioritizing applicants for admission into the ABD waiver

---

[5] I derive this figure using, for purposes of illustration Heartz's 1997 care budget, by subtracting the 25 percent state share ($7022.82) of costs for Heartz's nursing home care from the 50 percent state share ($50,654.60) of costs for Heartz's community based care under the Community Resources Council care plan.
Heartz also suggests that when comparing the cost of treating him in an institution and the cost of treating him in a community setting, I should use the cost of the most expensive institution to which he conceivably could be transferred in the future. I decline to engage in such a speculative exercise.

program. It is undisputed that the state cannot admit everyone who is eligible for admission into the program without (1) incurring millions of dollars in additional expenditures and (2) violating the Medicaid Act's cost-effectiveness requirement. Accordingly, to operate the program, the state had to develop a set of priorities to determine which candidates to admit immediately and how to classify the remaining individuals on a waiting list until additional spots could be opened without violating the reserve neutrality requirement. In determining who among a group of disabled applicants with comparable integration rights should first be admitted into the program, the state chose to favor applicants at risk of serious harm or regression in functioning, and applicants receiving services in out-of-state institutions. Applicants such as Heartz, who are not in immediate danger but who are inappropriately confined to institutions, are assigned a lower priority. Unless the state agreed to also admit everyone above Heartz on the waiting list, it could not admit Heartz without altering this system of priorities.

Although the record on this point is not well developed, it is highly unlikely that the state could immediately admit Heartz and everyone above him on the waiting list without violating the

Medicaid Act's cost-effectiveness requirement. If Heartz is typical of other recipients on the waiting list, it will cost the state an additional $1,750,000 annually to treat all 43 persons ranked with or above Heartz on the waiting list in community-based rather than institutional settings. Even if funds were available to cover these increased costs, and even if sufficient community placements could be found, it is virtually certain that these 43 recipients could not be added to the ABD waiver program without violating the Medicaid Act's cost-effectiveness requirement. Since any violation of this requirement would result in the termination of the entire program, this option simply is not available to the state.

The only other ways in which the state could immediately admit Heartz into the ABD waiver program would be if it either disregarded its priority ranking system entirely, or radically altered the system to favor Heartz over other applicants. Either option, however, would entail precisely the kind of fundamental alteration to the program that cannot be compelled by the ADA. Everyone on the ABD waiver waiting list has integration rights comparable to Heartz's and the state cannot admit everyone into the program without violating the Medicaid Act's cost-effectiveness requirement. In the face of this predicament, the

state has developed a rational system for regulating access to the program.  The integration regulation does not require a public entity to follow any particular formula for apportioning a finite number of community placement slots among a larger group of individuals with comparable integration rights.  Provided that the state has acted rationally, this difficult policy choice is properly left to the states that administer the program.

## IV.

While the ADA and its implementing regulations require integration where it can be accomplished without undue interference with legitimate state objectives,  the Medicaid Act limits a state's ability to use Medicaid funds to achieve this worthy goal.  Given the Medicaid Act's mandate for cost-effective integration and the reality that it will cost the state significantly more to treat Heartz in a community-based setting than it currently costs to treat him in a nursing home, the state cannot be compelled to admit him into the ABD waiver program without fundamentally altering its system for prioritizing admissions.  As Heartz is unlikely to prevail on the merits of

his ADA claim, I deny his request for a preliminary injunction.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

February    , 1999

cc:  Ronald Lospennato, Esq.
     Suzanne Gorman, Esq.