Larry D. GIBSON, Plaintiff,

v.

Crandle BRAY, individually and in his official capacity as Chairman of the Board of Commissioners of Clayton County, Georgia; and Ronnie Clackum, individually and in his official capacity as Clayton County Chief of Police, Defendants.

No. Civ.A.1:1997–CV–528–RWS.

United States District Court,
N.D. Georgia,
Atlanta Division.

June 25, 1998.

Donald C. English, McDonough, GA, for Plaintiff.

David Richard Kresser, Anderson B. Scott, Fisher & Phillips, Atlanta, GA, John Alvin Kimbell, Fincher & Hecht, Morrow, GA, for defendants.

## OPINION and ORDER

STORY, District Judge.

This action is before the Court on Defendants' Motion [8–1] for Summary Judgment.

### Background

Viewed in a light most favorable to Plaintiff Larry Gibson, see *L.C. by Zimring v. Olmstead*, 138 F.3d 893, 902 (11th Cir.1998), the facts of this case are as follows.

Plaintiff Gibson was employed as a uniformed police officer of the Clayton County Police Department continuously from 1977 until the present. During that employment, he was the subject of occasional citizen complaints as well as letters of commendation, and Defendant Chief Ronnie Clackum perceived Gibson's performance to be generally acceptable. Eventually, Gibson achieved the rank of Lieutenant, assigned to traffic duty as a Zone Commander supervising several junior police officers.

Lieutenant Gibson is a member of the Police Benevolent Association ("PBA"). Over a period of years, he was elected to various positions within the PBA, eventually rising to the position of President of the South Metro Chapter of the PBA of Georgia. In his capacity as a member and officer of the PBA, Lieutenant Gibson wrote numerous letters to the editor and articles published in the local newspaper. These writings typically addressed matters of concern to police officers, including compensation, manpower, officer safety, and allocation of county budgetary resources. Many of the articles were directly and highly critical of the policies and activities of Defendant Crandle Bray, Chairman of the Clayton County Board of Commissioners.

In addition, Lieutenant Gibson was concerned about the manner in which the county, allegedly through Chairman Bray, let certain contracts and made payments under them. Lieutenant Gibson believed the contracting and payments to be illegal and pursued those concerns with his superiors at the police department, the county solicitor's office, and the prosecuting attorney's office. No official charges were ever leveled against Chairman Bray arising out of these incidents.

Chairman Bray disliked Lieutenant Gibson and Lieutenant Gibson's attacks on him, and Chairman Bray repeatedly expressed to Chief Clackum his opinion that Bray should be discharged for these activities. Chief Clackum responded by explaining to Chairman Bray that Lieutenant Gibson could not properly be discharged for these activities, going so far in August of 1996, following the publication of another Lieutenant Gibson letter to the editor, as to send Chairman Bray a memo outlining his understanding of the free speech rights of public employees and analyzing their application to Lieutenant Gibson, concluding with a statement of his belief that Lieutenant Gibson could not properly be discharged for the letter.

On June 27, 1994, the Georgia Supreme Court issued its decision in *Mixon v. City of Warner Robins*, 264 Ga. 385, 444 S.E.2d 761 (1994). In that decision, the court held that, "if a vehicular pursuit is undertaken or performed without the requisite due regard for the safety of all persons and an injury occurs as the consequence, the officer can be held civilly liable even though the injury was actually inflicted by the fleeing criminal suspect." 264 Ga. at 388, 444 S.E.2d at 764. Applying that general rule to the facts presented in *Mixon*, the court further held that a jury would be authorized to find that a police officer had failed to balance the risk to the safety of other drivers when he persisted in his

efforts to arrest a driver for the minor offense of running a stop sign even after the driver had escalated his flight into a high-speed chase in a residential area. 264 Ga. at 390–91, 444 S.E.2d at 766.

Immediately after the *Mixon* decision was announced, Lieutenant Gibson began to express his displeasure with it. In an article published in the Clayton News/Daily on July 11, 1994, Lieutenant Gibson first questioned what would be considered a "minor offense," then stated, "I don't consider fleeing from the police a 'Minor Offense.' The P.B.A. and Rep. Gail Johnson will introduce a bill before the Georgia House of Representatives to make fleeing the police a felony in Georgia. That would make fleeing from the police more than a 'Minor Offense.'" (Def.Ex.F.)

On November 24, 1994, Clayton County revised its police pursuit policy in response to *Mixon*. The revised policy provided:

1. The pursuit of vehicles for which the only known or suspected offense is a minor traffic violation is prohibited.

2. The Zone Lieutenant is responsible and accountable for the enforcement of Procedure D3, "Emergency Driving, Section VI., Motor Vehicle Pursuits" in the Zone assigned....

. . .

These additions are being made due to the Georgia Supreme Court decision in *[Mixon] v. City of Warner Robins, et al.* which holds that a law enforcement officer can be held liable for injuries to a third party by the suspect being pursued....

Shortly thereafter, Lieutenant Gibson attended mandatory training on the new policy. In at least two conversations with Chief Clackum, Lieutenant Gibson continued to express opposition to the policy and to the absence of a clear definition of "minor" traffic violation.

Lieutenant Gibson bore responsibility under the 1994 pursuit policy for evaluating and approving or terminating high-speed pursuits for the officers he supervised. On June 25, 1995, Lieutenant Gibson was supervising a routine road check

when a car performed a U-turn and drove away from the road check. Initially, this car violated no traffic rules, but then ran two stop signs in leaving the area. Knowing nothing else about the driver or occupants of this car, Officer Jeff Hall pursued the car at high speeds through a residential neighborhood. Ultimately, Officer Hall drove through the front yard of a residence and crashed into the fleeing car. The pursuit lasted less than two minutes, and Lieutenant Gibson was otherwise engaged during the entire pursuit. When he was notified of it, he immediately changed radio channels to monitor the pursuit, but it was already over.

The Accident Review Board found the accident to have been preventable in light of the police department's pursuit policy. Hall was suspended for 18 days. Hall appealed the suspension to the Civil Service Board. Lieutenant Gibson appeared at the Civil Service Board hearing and testified in Officer Hall's behalf.

On December 5, 1995, based on reports of Lieutenant Gibson's testimony, Chief Clackum issued a letter of reprimand to Lieutenant Gibson, characterizing his testimony that pursuit of vehicles turning around at road checks is always justified because the vehicle is stolen or the driver is wanted for some felony as "contrary to existing Georgia law, departmental policy and departmental training." The reprimand further stated that "Your continuing unwillingness or inability to reconcile yourself to and officially accept policies resulting from binding court decisions is totally inappropriate and unacceptable. As a supervisor it is your duty to enforce these policies and not circumvent or undermine them." Lieutenant Gibson was not involved in any further incidents in which his application of the pursuit policy was questioned.

In the 1996 campaign for county commissioner, Chairman Bray was opposed by Hoyt Swaney, who received the endorsement of the PBA. Lieutenant Gibson actively and publicly campaigned for Swa-

ney, including driving him in local parades. Chief Clackum supported Chairman Bray, posting a sign in his yard endorsing Chairman Bray. Chairman Bray won the election.

In September 1996, effective late October 1996, Major Frank McCoy announced his retirement from the Clayton County Police Department. Major McCoy had supervisory authority over the Special Services Division, which had included the Animal Control Unit since it was transferred from another governmental department to the police department in the late 1980s or early 1990s. In addition, effective November 13, 1996, the civilian with day-to-day supervisory responsibility for the Animal Control Unit resigned. In light of his retirement, Major McCoy expressed to Chief Clackum his opinion that the command structure at the Animal Control Unit should be reorganized and that a ranking uniformed police officer should be on duty there at all times. Major McCoy's suggestion was based on the opinion that a uniformed police officer would be better able to diffuse volatile situations involving members of the public who are angry about their animal being taken to the Animal Control Unit and that a uniformed officer would be better able to supervise the eight Animal Control officers. Chief Clackum did reorganize the Animal Control Unit in November 1996, abolishing Special Services, assigning Lieutenant David Tidwell to have overall responsibility for the Animal Control Unit, and assigning Lieutenant Gibson to be the day-to-day supervisor at the Animal Control Unit to supervise the Animal Control positions and serve as the primary public contact person. Lieutenant Tidwell received a provisional promotion to Captain; Lieutenant Gibson's reassignment was a lateral transfer involving no loss of pay, benefits, or promotion potential. Lieutenant Gibson's transfer did result in the loss of his take-home marked patrol car for a short period of time until the police department purchased new vehicles, at which time Lieutenant Gibson was permitted to select a new vehicle.

Lieutenant Gibson's new assignment in the Animal Control Unit involves a substantial change in duties. As a Zone Commander, Lieutenant Gibson had supervised several police officers in the enforcement of traffic statutes. At the Animal Control Unit, Lieutenant Gibson supervises civilian employees, investigates violations of spay/neuter ordinances, writes citations, apprehends stray animals, investigates animal cruelty and dog-fighting complaints, and makes decisions as to which animals at the pound will be destroyed. It is undisputed that the presence of a uniformed officer is necessary for the issuance of citations.

During the time the Animal Control Unit was under the auspices of the police department, several officers were temporarily assigned to the Animal Control Unit because, at least in part, they were considered unable to perform other police duties for reasons including emotional problems or discipline. Other officers were temporarily assigned to the Animal Control Unit solely because of the needs of the Animal Control Unit and not because of any service problem. Some of these officers had experience as canine officers. Lieutenant Gibson has received no specific animal control training.

At approximately the same time he was transferred to the Animal Control Unit, Lieutenant Gibson was removed from the Personnel Review Board which recommends candidates for the position of police officer.

Based on these events, Lieutenant Gibson brought this action against Chief Clackum and Chairman Bray, in both their individual and official capacities, alleging in three counts that the Defendants infringed on his exercise of his free speech rights protected by the First and Fourteenth Amendments to the Constitution, retaliated against him for his expression of political viewpoints in violation of his rights under the First and Fourteenth Amendments, and infringed upon his free speech rights protected by Article 1, Section 1,

Paragraph 5 of the Georgia constitution of 1983. In the complaint, and in his deposition, Lieutenant Gibson asserted that the retaliation was based on his political activities and certain articles and letters to the editor; he did not contend that the retaliation was based on protected free speech activities related to the pursuit policy.

Defendants have moved for summary judgment on all claims, asserting that Lieutenant Gibson has suffered no adverse job action, that he cannot establish a causal connection between his speech and his transfer, and that Chief Clackum would have reached the same transfer decision even in the absence of any protected free speech activities. Finally, Chief Clackum contends that he is protected by the doctrine of qualified immunity. In his opposition, Lieutenant Gibson alludes briefly to the fact that even the transfer was based on Lieutenant Gibson's "disagreement with, or his questioning of, a new pursuit policy," Lieutenant Gibson should still prevail, because the pursuit policy is clearly an issue of legitimate public concern.

Although Defendants assert a right to summary judgment on all claims, nowhere in their supporting briefs do they address Lieutenant Gibson's state law claim. Accordingly, this Court concludes that the motion is limited to the federal claims.

## Discussion

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c).

The movant bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). For issues on which the movant would bear the burden of proof at trial,

> that party must show affirmatively the absence of a genuine issue of material fact: it must support its motion with

credible evidence ... that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

*United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1438 (11th Cir. 1991) (citations and internal quotations marks omitted). Where the non-moving party will bear the burden of proof at trial, the movant need not support its motion with evidence negating the opponent's claim, but may meet its initial burden by showing that the non-moving party has no evidence to support an essential element of its case. *Young v. City of Augusta,* 59 F.3d 1160, 1170 (11th Cir.1995). If the moving party fails to meet this initial burden, the motion must be denied. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). If the movant meets this initial burden, however, the non-movant then bears the burden of showing the existence of a genuine issue of material fact. Fed.R.Civ.P. 56(e).

### I. *The Adverse Job Action*

Lieutenant Gibson has presented sufficient evidence that he suffered an adverse job action to survive summary judgment on that issue. In dicta, the Supreme Court has stated that the First Amendment protects government employees from "even an act of retaliation as trivial as failing to hold a birthday party for a public employee .... when intended to punish her for exercising her free speech rights." *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 76 n. 8, 110 S.Ct. 2729, 2738 n. 8, 111 L.Ed.2d 52 (1990). While the Court of Appeals for the Eleventh Circuit has not applied that dicta specifically, it has stated

that the protections of the First Amendment apply whenever a government employee is "disciplined" for speech. *See Waters v. Chaffin,* 684 F.2d 833, 837 n. 9 (11th Cir.1982). The Eleventh Circuit has assumed without discussion that a transfer that involves no loss of benefits is an actionable adverse job action. *See Maples v. Martin,* 858 F.2d 1546, 1549 & 1551–55 (11th Cir.1988). Other courts have held that transfers that do not involve loss of economic benefits are actionable. *See, e.g., Allen v. Scribner,* 812 F.2d 426, 429 & 434 n. 16, *as amended by* 828 F.2d 1445 (9th Cir.1987); *McGill v. Board of Educ.,* 602 F.2d 774, 780 (7th Cir.1979) (holding that the "test is whether the adverse action taken by the defendants is likely to chill the exercise of constitutionally protected speech"), *cited with approval in Goffer v. Marbury,* 956 F.2d 1045, 1049 n. 1 (11th Cir.1992). Accordingly, for purposes of deciding this motion for summary judgment, this Court will assume that Lieutenant Gibson's involuntary transfer to the Animal Control Unit, which involved a substantial change in duties, a perceived diminishment of prestige, and the temporary loss of a take-home automobile, did constitute an adverse job action.

## II. *The First Amendment Claims*

A four-step test determines whether a public employer has unconstitutionally retaliated against a public employee for the exercise of free speech rights:

First, a court must determine whether the employee's speech may be fairly characterized as constituting speech on a matter of public concern. If so, the district court must weigh the employee's first amendment interests against the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees. Should the employee prevail on the balancing test, the fact-finder determines whether the employee's speech played a substantial part in the government's decision to demote or discharge the employee. Finally, if the employee shows that the speech was a substantial motivating factor in the employment decision, the state must prove by a preponderance of the evidence that it would have reached the same decision ... even in the absence of the protected conduct.

*Morgan v. Ford,* 6 F.3d 750, 754 (11th Cir.1993) (citations and internal quotation marks omitted), *cert. denied,* 512 U.S. 1221, 114 S.Ct. 2708, 129 L.Ed.2d 836 (1994). *See also Mt. Healthy City School Bd. of Educ. v. Doyle,* 429 U.S. 274, 283–87, 97 S.Ct. 568, 574–76, 50 L.Ed.2d 471 (1977); *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). The first two steps present questions of law; the last two present questions of fact. *Morris v. Crow,* 117 F.3d 449, 456 (11th Cir.1997). This same four-step test applies to claims that a state employee has suffered an adverse job action in retaliation for testimony given under subpoena. *See Hansen v. Soldenwagner,* 19 F.3d 573, 575–78 (11th Cir. 1994); *Martinez v. City of Opa–Locka,* 971 F.2d 708, 711–13 (11th Cir.1992).

For purposes of this motion, Defendants do not contest Lieutenant Gibson's ability to establish the first two parts of the test. Defendants do contend, however, that Lieutenant Gibson has failed to present any evidence to create a material dispute of fact as to whether any such protected speech was a "substantial motivating factor" in the transfer decision or to rebut Defendants' evidence that the same transfer decision would have been made even in the absence of such protected speech.

Viewed in a light most favorable to Lieutenant Gibson, he has presented sufficient evidence to raise a dispute as to whether his transfer was in retaliation for his speech critical of Chairman Bray. Both Chairman Bray and Chief Clackum have admitted that Chairman Bray once requested the transfer of a patrolman to act as liaison for the Commissioners' office and that Chief Clackum acquiesced in order to get off on the right foot with a new administration. Both Chairman Bray and Chief Clackum have admitted that Chairman Bray frequently urged Chief Clackum to discharge Lieutenant Gibson for his critical newspaper articles and letters to

the editor. Chief Clackum displayed a sign in his yard supporting the re-election campaign of Chairman Bray. And Chief Clackum transferred Lieutenant Gibson just a few days after Chairman Bray's re-election. While the defendants, and even Lieutenant Gibson, have produced some evidence tending to show that the transfer was accomplished for reasons other than such retaliation (*e.g.*, the contemporaneous departures of the police and civilian administrators of the Animal Control Unit, the related reorganization of the Animal Control Unit, the need for a uniformed officer to be available to write citations), inferences reasonably drawn from the evidence of retaliation and of Chairman Bray's influence over transfer decisions are sufficient to raise a dispute as to whether Lieutenant Gibson's protected speech was a substantial motivating factor in the transfer decision.

■ That leaves only the question whether Lieutenant Gibson has demonstrated the existence of rebuttal evidence sufficient to raise a dispute as to the Defendants' showing that Chief Clackum would have reached the same decision even in the absence of the protected speech. The Defendants have produced evidence that the uniformed and civilian administrators of the Animal Control Unit both departed in the autumn of 1996, with Major McCoy making the suggestion that the Animal Control Unit should be reorganized to assign a uniformed officer on a daily basis, that Chief Clackum followed that recommendation, determining to assign a lieutenant with supervisory skills, that he considered this an appropriate opportunity to reassign one of several lieutenants who had demonstrated opposition to the pursuit policy, that he considered only such lieutenants for the position, and that he determined the assignment best suited to Lieutenant Gibson, who had good supervisory skills and had demonstrated the most vehement opposition to enforcement of the pursuit policy.

While Lieutenant Gibson denied in deposition that he had ever been unwilling to enforce the pursuit policy, he did not present any evidence to rebut the clear evidence of Chief Clackum's understanding that Lieutenant Gibson would not or could not enforce the policy properly. Lieutenant Gibson admitted that he did not, even at the time of his reprimand, bring to Chief Clackum's attention the fact that Chief Clackum misunderstood his position, which he claimed to be one merely of a difference of opinion as to the meaning and application of the policy. Indeed, even if Lieutenant Gibson's protestations that he merely sought "clarification" of the policy are credited, that evidence does not diminish the evidence that Chief Clackum would have reached the same decision in the absence of any protected speech activities, even those specifically related to the pursuit policy, as the decision was based on Chief Clackum's perception of Lieutenant Gibson's "unwillingness *or inability*" to enforce the pursuit policy coupled with his knowledge that Lieutenant Gibson possessed other skills necessary to successfully oversee the daily operations of the Animal Control Unit. *Cf. Mt. Healthy,* 429 U.S. at 286, 97 S.Ct. at 575 (a "candidate ought not to be able, by engaging in [protected speech], to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision"); *Marshall v. City of Cape Coral,* 797 F.2d 1555, 1561 (11th Cir.1986) ("While the exercise of individual liberties must not be chilled, such rights are not a shield to protect one from one's own malfeasance"). *Cf. also Berry v. Bailey,* 726 F.2d 670, 672–76 (11th Cir.1984) (deputy's refusal to follow sheriff's policy, even dishonest policy, is not protected speech in the first instance, but is insubordination justifying discharge), *cert. denied,* 471 U.S. 1101, 105 S.Ct. 2326, 85 L.Ed.2d 844 (1985).

Similarly, Lieutenant Gibson has presented no evidence to rebut Chief Clackum's testimony that he temporarily required Lieutenant Gibson to give up his

marked patrol car because the patrol car was needed for his replacement on traffic duty. Nor has Lieutenant Gibson presented. any evidence to rebut Chief Clackum's testimony that he rotated Lieutenant Gibson off the Personnel Review Board at the same time as several other members in accordance with his standing policy to rotate membership on that board every one to two years. Accordingly, the Defendants are entitled to summary judgment on the First Amendment claims.

### III. *The State Law Claim*

Pursuant to 28 U.S.C. § 1367(a), in any civil action in which a federal district court has original jurisdiction, the district court shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the Constitution. Pursuant to § 1367(c), however, a district court may decline to exercise such supplemental jurisdiction if the district court has dismissed all claims over which it had original jurisdiction.

In *Palmer v. Hospital Auth. of Randolph County,* 22 F.3d 1559, 1569 (11th Cir.1994), the Court of Appeals for the Eleventh Circuit held that whenever a federal court has supplemental jurisdiction under § 1367(a) that jurisdiction should be exercised unless § 1367(b) or (c) applies. When subsection (c) permits a court to decline to exercise its jurisdiction, the court's discretion should be guided by the factors described in *United Mine Workers v. Gibbs,* 383 U.S. 715, 725–27, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966): judicial economy, convenience, fairness to the parties, and comity. *Palmer,* 22 F.3d at 1559. Typically, where federal claims are dismissed before trial, these factors will favor dismissal of the state claims. *See, e.g., Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988); *United Mine Workers,* 383 U.S. at 726, 86 S.Ct. at 1139; *Baggett v. First Nat'l Bank of Gainesville,* 117 F.3d 1342, 1352–53 (11th Cir.1997).

This Court finds that the state law claim remaining in this action is best resolved by the Georgia state courts. The remaining claim raises issues of state law only that do not implicate federal interests in any manner. Because 28 U.S.C. § 1367(d) tolls the state statute of limitations, no unfairness to Lieutenant Gibson results from dismissal.

### *Conclusion*

For the foregoing reasons, it is hereby ORDERED that Defendants' Motion for Summary Judgment is GRANTED IN PART as follows:

1. Defendants' Motion [8–1] for Summary Judgment is GRANTED as to Plaintiff's federal claims;

2. Defendants' Motion for Summary Judgment is DENIED as to Plaintiff's state law claim; and

3. Plaintiff's state law claim is DISMISSED WITHOUT PREJUDICE.

The Clerk is DIRECTED to enter final judgment accordingly.

SO ORDERED.